UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF LOUISIANA

UNITED STATES OF AMERICA,      *      Docket No. 3:05-121-LMA
                               *
                Plaintiff,     *
                               *
VS                             *      July 13, 2018
                               *
WAYNE LEE PALMER,              *
                               *
                Defendant.     *      New Orleans, Louisiana
                               *
*********************************************************************

        REPORTER'S OFFICIAL TRANSCRIPT OF THE HEARING REGARDING
                        CONDITIONAL RELEASE
              BEFORE THE HONORABLE LANCE AFRICK,
                 UNITED STATES DISTRICT JUDGE.

*********************************************************************

APPEARANCES:

For the Government:              U.S. Attorney's Office
                                 BY: MS. PATRICIA JONES
                                     MR. FREDRICK MENNER, JR.
                                 777 Florida St., Ste. 208
                                 Baton Rouge, LA  70801


For the Defendant:               Public Defender's Office
                                 BY: MR. RICHARD M. UPTON
                                 707 Florida St., Ste. 303
                                 Baton Rouge, LA  70801


REPORTED BY:      Mary V. Thompson, RMR, FCRR
                  500 Poydras Street, Room 275
                  New Orleans, Louisiana 70130
                  (504)589-7783

**OFFICIAL TRANSCRIPT**

# P R O C E E D I N G S

(Call to order of the court.)

THE COURT:  Thank you.  Good morning, everybody.

MR. UPTON:  Morning, Your Honor.

THE COURT:  Call the case, please.

THE CASE MANAGER:  Criminal matter 2005-121, *United States of America v Wayne Lee Palmer*.

This matter is set for hearing regarding a recommendation for a conditional release.

Counsel, please make your appearances for the record.

MS. JONES:  Morning, Your Honor.  Patricia Jones and Fred Menner for the United States.

MR. UPTON:  Good morning, Your Honor.  Mark Upton, Assistant Federal Public Defender, for Mr. Wayne Lee Palmer.

THE COURT:  Thank you, Counsel.

Mr. Palmer is participating by telephone from the federal correctional facility in Rochester, Minnesota.

As was stated, we're here to determine if there should be a conditional discharge of the defendant pursuant to the recommendation of the persons providing treatment at the federal correctional facility in Rochester.  And the issue is whether he should be conditionally discharged pursuant to the requirements of 18 USC, Section 4243.

This hearing is going to be bifurcated. Dr. John Thompson, who is very familiar with this case, testified

*10:32:04*
*10:32:15*
*10:32:29*
*10:32:48*
*10:33:11*

**OFFICIAL TRANSCRIPT**

1    last time we had a hearing.  He's going out of town so we're

2    taking his testimony today, and the testimony of the remainder of

3    the witnesses will be taken on July 30th in this courtroom.

4            All right, Counsel, are you prepared to go forward?

10:33:32    5            MR. UPTON:  I am, Your Honor.

6            MS. JONES:  We are, Your Honor.

7            And, Your Honor, at the outset, we would move for

8    admission of the joint exhibits.  There are 15 joint exhibits,

9    1 through 15, and we would move for admission of those at this

10:33:48   10    time.

11            THE COURT:  Any objection?

12            MR. UPTON:  No objection.

13            THE COURT:  They will all be admitted.

14            Dr. Thompson, why don't you come to the witness stand.

10:33:56   15            Let me suggest one other thing that might make this go

16    a little quicker, because the exhibits include Dr. Thompson's

17    report and the appendix that he prepared, which is part of

18    Exhibit 1.  My suggestion would be that there be a stipulation

19    that if he was asked, that he would testify that both his report

10:34:17   20    and the appendix are his work product and he would testify

21    consistent with all of those matters contained within those

22    documents.

23            MS. JONES:  Yes, Your Honor.  We would so stipulate.

24            MR. UPTON:  Likewise we would as well, Your Honor.

10:34:35   25            THE COURT:  All right.  Of course, follow up on

**OFFICIAL TRANSCRIPT**

```
 1    anything in his report.

 2            So you have the burden, sir, so we'll begin with you.

 3            Let's swear the witness.

 4                              (The oath was administered.)

 5            THE CASE MANGER:  Have a seat.

 6            Please state your name for the record.

 7            THE WITNESS:  John W. Thompson, Jr., M.D.

 8                     JOHN W. THOMPSON, JR., M.D.,

 9    having been first duly sworn, testified as follows, to wit:

10                         DIRECT EXAMINATION

11    BY MR. UPTON:

12        Q.    Dr. Thompson, just give us a brief rundown of your

13    curriculum vitae for the record, please.

14        A.    Sure.  So I finished at the University of Texas in

15    San Antonio, undergraduate, in 1982.  I was stationed in the

16    Air Force as an X-ray tech at the time.

17            And then I completed medical school from 1982 to 1986

18    at the University of Texas Medical Branch in Galveston, Texas.

19            And enrolled at the University of Florida for

20    psychiatry residency training and a forensic fellowship, which I

21    completed in 1990.

22            I came back to Louisiana, and I'm licensed to practice

23    in Louisiana.

24            And I have boards in general adult psychiatry with

25    added qualifications in addiction psychiatry and in forensic
```

10:34:47
10:35:00
10:35:13
10:35:33
10:35:47

**OFFICIAL TRANSCRIPT**

1  psychiatry.

2      Q.    How are you currently employed?

3      A.    I'm presently the Chairman of the Department of

4  Psychiatry at Tulane University in New Orleans.

*10:36:02*

5            And I have a subcontract with the State of Louisiana,

6  and my title is the Chief of Staff of the Eastern Louisiana

7  Mental Health System, which includes both the forensic hospital

8  and also the long-term civil hospital at East Louisiana State

9  Hospital up in Jackson.

*10:36:22*

10     Q.    You're familiar with this patient; is that correct?

11     A.    Yes.  I've evaluated him on three occasions.

12     Q.    And this last evaluation that you performed, what was

13  that for?

14     A.    Basically we were looking at the issue of whether or

*10:36:37*

15  not he could be released from the federal medical center in

16  Rochester without presenting a substantial danger to the public.

17     Q.    And as part of that recommendation -- that was based on

18  a recommendation from a risk panel who performed that evaluation

19  of the defendant at Rochester, Minnesota; is that correct?

*10:37:01*

20     A.    Yes.  I believe there is a process for them to do that

21  evaluation yearly.

22            And prior to this evaluation, they had recommended that

23  he remain at the facility because he presented a danger if he

24  went out into the community.  And then the most recent one, they

*10:37:17*

25  recommended that he be released.  And they made some

**OFFICIAL TRANSCRIPT**

1    recommendations as far as the group home that they would suggest
2    he go to.
3        Q.    And you have reviewed their recommendation -- their
4    evaluation and recommendation dated December 29, 2017?

*10:37:35*    5        A.    Yes.
6        Q.    And you're familiar with the conditions that they say
7    that he could be released under?
8        A.    Yes, I am.
9        Q.    Now, without going through those conditions, are those
*10:37:52*   10    conditions alone, based on your recommendation for -- for
11    Mr. Palmer -- are those conditions alone satisfactory to you?
12        A.    No.
13        Q.    What other conditions would you -- well, first let me
14    back up.
*10:38:10*   15             Is he releasable on conditions?
16        A.    You know, I think that would depend on the place that
17    he was released to and the mechanism to maintain his continued
18    compliance with medication, and to have him monitored in a
19    supervised setting that would have 24-hour supervision over him.
*10:38:32*   20             So the recommendation was to a particular group home in
21    New Orleans.  As part of the due diligence of my evaluation, I
22    had one of my physicians, who's very familiar with both forensic
23    and non-forensic group homes in the state and particularly in
24    New Orleans -- I requested that, you know, she take a look at the
*10:38:54*   25    group home, sort of do what we would call a home study or a group

**OFFICIAL TRANSCRIPT**

1    home study, and let me know whether that was an appropriate place

2    for someone to be released.

3         She informed me that there was not really 24-hour

4    supervision there; that it wasn't a locked facility; and

*10:39:12*  5    typically they had not had any forensic clients there, and

6    particularly federal forensic clients followed up there.

7         So I didn't feel that that was an appropriate placement

8    for him.

9    **Q.**  Let's back up.  And comparing the conditions that were

*10:39:33*  10   recommended by the risk panel in Minnesota, would any of those be

11   conditions you would not recommend?

12   **A.**  No, other than -- other than the recommendation for him

13   to go to the group home.  So the typical conditions that they

14   would recommend matched relatively closely with the types of

*10:39:55*  15   recommendations that I would consider for a client like this.

16        And I believe, you know, I talked about some of the

17   recommendations that I had, and some of those matched.  I guess

18   the most important ones would have to do with ensuring medication

19   compliance, as Mr. Palmer has never felt that he's had a mental

*10:40:18*  20   illness in the three times that I've evaluated him over the last

21   13 years or so.  He's maintained that he does not have a mental

22   illness and doesn't need medication.  So initially medications

23   had to be forced on him, and now he takes monthly injections

24   so -- to ensure compliance with the medications.

*10:40:40*  25        He doesn't object to those, but if we were going to

**OFFICIAL TRANSCRIPT**

1  have a conditional release plan, that would definitely have to be

2  part of the plan because I think he could easily deteriorate to

3  the point where he would say, "I don't want to take medication

4  anymore."

10:40:55

5      Q.   So you would make sure that a part of any plan that

6  would result in his release would be assurance of medication --

7  assurance of administration of medication?

8      A.   Right.  Administration of medication would have to be

9  done regularly.

10:41:13

10          Number two, and I think probably one of the more

11  critical aspects, is that he cannot have in any way, shape, or

12  form access to weapons.

13          So he's demonstrated in the past by his two --

14  technically three interactions with federal law enforcement that

10:41:35

15  he maintained that he would have to possess a weapon or he had

16  the right to possess a weapon, and he did actually have a weapon

17  on two of those occasions.  So that's, obviously, a big deal with

18  making sure that he would not have access to weapons or not be in

19  a place where it would be readily available to him.

10:41:54

20      Q.   In addition to those two conditions, what else?

21      A.   You would want him to be in a facility that had 24-hour

22  monitoring or close monitoring where he would not be able to

23  wander off.  I mean, part of that -- part of the issue with the

24  weapons is that, you know, almost any place in Louisiana you can

10:42:16

25  get a weapon fairly quickly, and so you wouldn't want him to

**OFFICIAL TRANSCRIPT**

1  be -- not be monitored for a long period of time so that he could

2  gain access.

3      Q.    Okay.  So we have the conditions for -- that are

4  suggested by Rochester and then you've got at least three.  Are

*10:42:39*  5  there more?

6      A.    Well, typically -- he's not someone that's a high risk

7  for substance use, but typically we would put those

8  recommendations in -- that he can't really go to a bar or an

9  establishment where he would have alcohol or have access to

*10:42:53*  10  alcohol -- because we know that when folks consume alcohol or

11  other drugs, they are at a much higher risk to get involved in

12  aggressive behavior.

13          That's not been a big factor for him, but it wouldn't

14  hurt to put that in the recommendation so that he would not be

*10:43:11*  15  allowed to go to places where, you know, fighting is likely to

16  occur, arguments are to occur, and certainly establishments where

17  folks are drinking.  It's much more common than out in the

18  regular public.

19      Q.    Any additional conditions?

*10:43:25*  20      A.    Those are the main ones that I would be considering --

21  or I would want to consider in addition to what Rochester said.

22          And then we talked about the group home location or the

23  type of group home.  So the -- you certainly would want a group

24  home that would be familiar with forensic clients and be aware of

*10:43:45*  25  how difficult sometimes it can be to take care of them and to

**OFFICIAL TRANSCRIPT**

1  monitor them.

2         And you would want that facility to have professional

3  staff that could evaluate someone like Mr. Palmer.  At times he

4  has very subtle psychotic symptoms that, you know, pop up from

10:44:03  5  time to time, and you'd want to have someone there that could

6  perform that evaluation, was familiar with the client.  So either

7  a social worker or a nurse or...

8         We always have -- in the state anyway, we always have

9  psychiatrists readily available, and they are part of the group

10:44:18  10  home process so they can evaluate the person regularly to make

11  sure that their, you know, subtle paranoid symptoms aren't

12  leaking out because that tends to be, you know, when these guys

13  get in trouble.

14         You know, the one symptom that we really can't do a

10:44:35  15  whole lot about is this whole idea that kind of underlies and

16  drives all the behavior that he has, and that is that he still

17  maintains that somehow or another through the court system that

18  he is owed somewhere between $1 million and $3 million from the

19  times that I evaluated him.  And a lot of times that -- at least

10:44:58  20  in the past it has driven some of the behaviors where he has

21  gotten involved with federal law enforcement.  That he's either

22  going to the court system to confront federal marshals or he may

23  be going to the law library or places that he shouldn't be when

24  he's armed with weapons and things like that.

10:45:18  25         So that underlying delusion is probably something that,

**OFFICIAL TRANSCRIPT**

1  even with medications, is never going to go away.  And then the

2  underlying thought that he doesn't have a mental illness is

3  probably never going to go away.

4          So those things I think are important to assess and

10:45:35  5  reassess by the treatment professionals.

6      Q.   Those conditions themselves, his delusions, would not

7  by themselves be reason for non-release; is that correct?

8      A.   No, not by themselves.  I mean, you take the total

9  picture together and look at -- when we look at risk assessment,

10:45:54  10  we're really looking along two -- I would say the easiest way to

11  look at it is you look along two strings.  One would be how

12  anti-social the person is or how frequently they get involved

13  with law enforcement, would be one level of dangerousness that

14  you look at.

10:46:12  15          And the other would be how mentally ill are they and

16  how aware are they of their mental illness?

17          So when you're trying to stratify risk, you can do all

18  kinds of complex risk assessments, but really those are the

19  things you're looking at.  How frequently are they likely to get

10:46:29  20  involved in altercations or get involved with law enforcement?

21  And how mentally ill are they?  And are they willing to address

22  those problems with their mental illness?

23      Q.   This patient had one interaction with a fellow patient,

24  and that was more than eight years ago by the records from the

10:46:50  25  forensic facility; is that correct?

**OFFICIAL TRANSCRIPT**

1     **A.**   Yeah.  At the facility itself, when he's at the

2 facility, he's not regularly confronting people on a regular

3 basis.  He tends to stay to himself.  He would be more someone we

4 would refer to as kind of a quietly psychotic person.

*10:47:06*    5         So while he's on medications, he'll still have

6 delusional beliefs, and occasionally he'll have beliefs that

7 are -- where he talks about hearing voices or he talks about some

8 odd or unusual beliefs that he has that pop up, but he's not

9 frequently punching other clients or being dangerous.

*10:47:25*    10         And that's probably why he's at the Rochester facility.

11     **Q.**   So given the conditions that -- with Rochester, the

12 additional conditions that you placed on him, are there any more

13 conditions that you would recommend?  Or those you think would be

14 about the gamut?

*10:47:40*    15     **A.**   I think those are the most salient.  I don't know that

16 I have -- every single one, you know, would pop up into my head

17 right here sitting in the witness chair, but those are the ones I

18 think are the most important.

19         THE COURT:  Excuse me.  Dr. Thompson, I just want to

*10:47:55*    20 get one thing on the record.

21         In connection with leading up to this testimony, you've

22 reviewed about 5,000 pages of medical records which you summarize

23 under Appendix I; is that correct?

24         THE WITNESS:  Yes, sir.

*10:48:07*    25         THE COURT:  And you've also interviewed him through

**OFFICIAL TRANSCRIPT**

1  video conferencing separately and individually without anyone

2  being in the room for about two hours by video conference,

3  correct?

4          THE WITNESS:  That's correct.  I think there was a --

10:48:16   5  one -- one of the staff members from the facility was there with

6  him to help him be more comfortable, but no one was in the room

7  with me.

8          THE COURT:  I'm sorry.  Anything else you want to say?

9  MR. UPTON:  (CONTINUING)

10:48:27   10     Q.   So if a suitable -- if a facility could comply with the

11  conditions recommended by the forensic team at Rochester and your

12  additional conditions, would that -- would you agree that

13  Mr. Palmer could be released to a facility that had that type of

14  coverage and that was able to comply with those types of

10:48:55   15  conditions?

16     A.   If they were able to comply with those types of

17  conditions, then I think it would be reasonable to give him a

18  trial at that particular facility; but, you know, those are

19  relatively strict conditions for most group homes to comply with.

10:49:10   20          What I would say in addition to that is that in many of

21  these group homes, even in our own, they eventually graduate to a

22  position where they can go out into the community or they're less

23  supervised over time, and at the present time I would not

24  recommend that that happen.

10:49:29   25          So he would have to be at the highest level of

**OFFICIAL TRANSCRIPT**

1    restriction at that group home because of the issues that I

2    discussed before, that he really doesn't feel he has a mental

3    illness, and we would have to be very careful that he doesn't get

4    out and get access to weapons again.

*10:49:46*

5    THE COURT:  Dr. Thompson, because of many of the issues

6    which you mentioned in your report, and here in court today,

7    there was another option you provided to the Court, and that was

8    to have him remain at FMC Rochester for an additional year to

9    monitor his compliance with medication and monitor whether he

*10:50:01*

10   maintains the position that he will not possess weapons once

11   released from the hospital; is that right?

12   THE WITNESS:  Yes.  And the reason for that

13   recommendation was because that -- the idea -- the last two times

14   I've interviewed him, he was adamant that he should have a right

*10:50:20*

15   to possess weapons, and that that was one of his rights and that

16   he had planned to do that.

17   Over time while he was at -- when he was at the

18   facility, that belief didn't seem to be as tightly held when I

19   evaluated him this time.  And I asked him specifically about

*10:50:41*

20   that, and he said, "Well, I know when I go out, I cannot have a

21   weapon."

22   So he was pretty adamant about that compared to

23   previous, but that had been recent in my evaluation of him.  I

24   was surprised that he actually said that.

*10:50:55*

25   Sometimes we get guys that will say things because they

**OFFICIAL TRANSCRIPT**

1   realize if they don't say it, they're never getting out.  They at

2   least have enough awareness to figure that out.  In the past he

3   just really held tightly to that belief.

4        So if the Court felt more comfortable with him -- us

10:51:11  5   kind of evaluating him, is that going to stick -- is that belief

6   going to stick with him or is it going to wax and wane?

7        That's why I made the recommendation that maybe he

8   should stay another year, have him reevaluated with another

9   panel, and see if he maintains that position for a period of

10:51:29  10   time.

11   **Q.**   One of the facilities -- one of the facilities that you

12   recommended has a panel -- has a step-by-step evaluation where

13   they start at the highest, most restrictive step?

14   **A.**   Correct.

10:51:46  15   **Q.**   And then they earn their way out of that step to the

16   next lower step, which is more -- I guess they are allowed a

17   little more latitude?

18   **A.**   Yeah.

19   **Q.**   Would a situation like that -- a facility that provides

10:52:02  20   that type of care in a step fashion, would that be a suitable

21   facility to release him to?

22   **A.**   Well, both of the ones that I recommended would have a

23   level system.  So it would be levels -- usually Levels 1

24   through 4 is how they do it.  And Level 1s are the most

10:52:23  25   restricted.  And when they get to Level 4, they have a lot of

**OFFICIAL TRANSCRIPT**

1    freedom.

2              At the present time, even though I would recommend that

3    that could be a possibility with all the conditions, I would

4    definitely want him to remain on a Level 1 status because I don't

10:52:38    5    really feel comfortable with him being able to go outside of the

6    facility for any period of time without supervision.

7         Q.    And any change in his status would have to be brought

8    to the Judge, and the Judge would make the decision about his

9    change of status in the facility; is that correct?

10:52:57    10         A.    Well, you were asking what other recommendations that I

11    would put in the conditional release order.  I think that, you

12    know, it would be really important to stipulate that.  Okay?

13              Because sometimes, once they get in the group home, the

14    group home gets comfortable with them as well and they're sort of

10:53:16    15    advancing them through the level system.  So we've had cases like

16    that.

17              In the state we have district forensic coordinators

18    that monitor them.  If the district forensic coordinator says,

19    "Hey, well, so and so group home is recommending him to go to

10:53:31    20    Level 3, but I don't think the Judge wants him to go to Level 3,"

21    then we can pull it back into court and say, "Hey, Your Honor, it

22    looks like they're ready for him to go to Level 3, are you ready

23    for Level 3?"

24              So there are ways to do that, but you have to keep a

10:53:43    25    close eye on it.

**OFFICIAL TRANSCRIPT**

1      THE COURT:  Doctor, would it be prudent in your

2  opinion -- you gave the Court these two alternatives.  Would it

3  be prudent for the Court to allow him more time to prove himself

4  with respect to compliance, and some of these other issues that

10:53:58    5  he has, prior to placing him in a secure group home somewhere in

6  Louisiana?

7      THE WITNESS:  I think -- part of the reason why I made

8  more than one recommendation is because I thought both

9  recommendations were prudent recommendations.

10:54:10    10      And certainly, you know -- I never questioned --

11  everybody looks at the record, and we all look at it a little

12  different.  And psychiatrists tend to look at it differently than

13  courts or judges do.  So I always like to give some options so

14  that, you know, if you feel more comfortable with that option,

10:54:30    15  then that's an option that you can use.

16      But either one of them are reasonable options.

17      MR. UPTON:  That's all the questions I have.

18      THE COURT:  Thank you very much.  I appreciate that.

19      Ms. Jones.

10:54:41    20      MS. JONES:  Thank you, Your Honor.

21                      **CROSS-EXAMINATION**

22  BY MS. JONES:

23      **Q.**   Dr. Thompson, I wanted to ask you first about some of

24  the risk factors that lead you to the recommendations you make

10:54:59    25  for the conditions.

**OFFICIAL TRANSCRIPT**

1       A.    Sure.

2       Q.    And I know you already mentioned that you look at the

3   seriousness of the mental illness; is that right?

4       A.    That's correct.

10:55:06   5       Q.    And Mr. Palmer has a very serious mental illness,

6   correct?

7       A.    He probably has one of the most serious mental

8   illnesses an individual can have.

9       Q.    And that's chronic paranoid schizophrenia?

10:55:18  10       A.    Yes.  That's my opinion.

11            There have been some other diagnoses that he has been

12   given, but I believe that that's the most correct diagnosis given

13   his longitudinal history.

14       Q.    That's not something that's curable, that just goes

10:55:31  15   away?  It's a life-long illness?

16       A.    Yeah.  Presently it's a life-long illness just like if

17   you had diabetes or hypertension and you have to take medication

18   for the rest of your life to control that.  Schizophrenia is very

19   similar.

10:55:45  20            And there are parts of the brain in schizophrenia that

21   don't communicate well with each other.  And then there are --

22   there's sort of what we consider a heightened sense with

23   schizophrenia, so the person tends to have either a heightened

24   sense of smell or they see things that aren't there or they may

10:56:04  25   have beliefs, fixed false beliefs, that we call delusions that

**OFFICIAL TRANSCRIPT**

1  are present that everybody else around them says, "Hey, that's

2  not right, it doesn't make sense," but they hold it.  It's tight.

3  It's something that they just don't let go of.

4          And so that's -- those are really -- the big problems

10:56:22  5  that they have are primarily around the delusional system.  I

6  mean, hallucinations are pretty easy to treat with medications.

7  Delusions take a long time to go away.  And sometimes they never

8  go away.

9          And so given the chronic nature of his delusions, I

10:56:38  10  doubt his delusions are ever going to go away.  The delusions

11  that most people believe that he -- know he has a mental illness,

12  but he really doesn't believe he has a mental illness even though

13  I've talked to him on three occasions and said, "You know, there

14  are ten people that are pretty educated that think you have this

10:56:57  15  problem."  And he's like, "No, I don't have it.  I know I don't

16  have it.  I know you guys think I have it, but I don't have it."

17          And that's a term we call anosognosia.  It's kind of a

18  fancy term.

19      Q.   Could you spell that for the court reporter, please.

10:57:11  20      A.   A-n-o-s-o-g-n-o-s-i-a.

21          It happens in people who have strokes sometimes

22  because, you know -- when we're looking at one syndrome versus

23  the other.  But you can have a stroke and not feel one part of

24  your body and you think someone else is in the bed with you.  You

10:57:27  25  don't think that's you, it's a foreign person or an alien person.

**OFFICIAL TRANSCRIPT**

1        Or you could think that you don't have a symptom.  You

2  see it sometimes with people with dementia where you say, "Well,

3  you know, mom, your memory's slipping."  And you get, "What are

4  you talking about?  I don't have a memory problem."

10:57:41   5        So it's an inability to recognize a particular symptom

6  or an inability to recognize a particular disorder.  And it's

7  very common in people with severe mental disorders.  So

8  individuals with schizophrenia or individuals with severe bipolar

9  will oftentimes not be able to recognize that they have a problem

10:57:58  10  even though everyone else around them can.

11       Q.   Let me try to unpack some of that as we go along,

12  because I think you said a lot of different risk factors all in

13  that answer.

14        But before we even get to some of those, his past

10:58:16  15  behavior is a good predictor of his future behavior, correct?

16       A.   That's correct.  So we try and look at patterns and

17  themes of that past behavior to see if they will -- and try and

18  protect against those kinds of things happening.  But the past

19  behaviors are definitely predictive of future behaviors.

10:58:37  20       Q.   And you've already mentioned several, but you mentioned

21  he threatened to kill a court security officer?

22       A.   That's correct.

23       Q.   Then when he was arrested shortly -- a couple days

24  later, he went inside his house, got a loaded weapon, refused to

10:58:51  25  cooperate with the arrest, and actually resisted arrest by the

**OFFICIAL TRANSCRIPT**

1    federal agents, correct?

2        A.    Yes.

3        Q.    Then you have -- after he promised not to get a gun,

4    said he had no interest in getting a gun, he was released, and

5    within a month purchased a weapon and lied on the form when he

6    purchased the weapon, correct?

7        A.    Yes.

8        Q.    And then about five months later, he was arrested when

9    he was sitting outside of the law school with the loaded weapon

10   on his seat while the judges were inside at a conference,

11   correct?

12       A.    Yes.  And another part of that particular arrest is

13   that as the guys approached his car, he really didn't feel like

14   they had the authority to arrest him.  And so I thought it was

15   more of a high-speed chase than it was, but it was more like a

16   slow-rolling chase is the best way for that to be described.

17           But, you know, he still didn't -- even when I

18   interviewed him this time, he said that he didn't believe that

19   they had authority to arrest him or to tell him to do anything.

20       Q.    So is that one of those fixed false beliefs that you

21   talked about?  Or is that something else?  Why does he think that

22   the agents had no authority to arrest him?

23       A.    I think he really believes that, you know, the

24   Baton Rouge police had more authority over him than the federal

25   marshals had over him, and that it was inappropriate for them to

**OFFICIAL TRANSCRIPT**

10:59:05

10:59:21

10:59:37

10:59:55

11:00:13

1    be there.  And, you know, they shouldn't have been able to arrest

2    him where they were.

3              So he has a lot of -- he has a lot of beliefs around

4    that, around what authority police have or what they don't have

11:00:29    5    depending on what their status is and that kind of thing.

6              Some of it's based in reality and some of it is not, so

7    it's intermixed.  It's not totally delusional, but it's not what

8    you or I -- I mean, if someone shows up with "the FBI" on their

9    shirt, I'm going to say whatever you want me to do, I'm going to

11:00:46    10    do.  Or with a marshal or whatever.  A person of authority with a

11    badge, you usually listen to them.

12              And I don't think that that's the case with him.  I

13    think he sorts out in his head whether he should or he shouldn't.

14              THE COURT:  Doctor, with respect to the first arrest

11:01:00    15    that Ms. Jones spoke about, the one he went to Butner for --

16    Judge Duplantier was the presiding judge in that case?

17              THE WITNESS:  Yes.

18              THE COURT:  I was looking at Exhibit 14 -- and I've

19    read all the exhibits.  There was a request by the -- am I

11:01:18    20    correct, there was a request by the institution for forced

21    medication, and Judge Duplantier declined to do that?  Is that

22    correct?

23              THE WITNESS:  Yes.

24              THE COURT:  And also am I correct that the warden --

11:01:29    25    the letter by the staff psychologist and the staff psychiatrist

**OFFICIAL TRANSCRIPT**

1  indicated it was their opinion that his release would not create

2  a substantial risk of bodily injury to another person or serious

3  damage to property of another.  And he did not appear to present

4  an imminent risk of harm to others in an institutional setting.

*11:01:48*  5  Is that correct?

6          THE WITNESS:  Yeah, that was their opinion.

7          THE COURT:  Okay.  Then we know, as Ms. Jones stated,

8  within six months we have the incident which case we have before

9  us right now?

*11:01:58*  10          THE WITNESS:  Yes.  So there was a release, and then he

11  went out and had another offense and had to come back in.

12          So if you're going to -- for dangerousness, you would

13  look into that issue as being an issue where, you know, he was

14  basically told he had to behave and he was okay to go out into

*11:02:19*  15  the community, and then he didn't.  So that is definitely

16  something you would consider for a risk.

17  MS. JONES:  (CONTINUING)

18      Q.  Another risk factor you already mentioned is the -- and

19  I know I'm going to mispronounce it again -- the anosognosia?

*11:02:31*  20      A.  Anosognosia.  I would say inability to recognize that

21  you have a mental disorder.

22      Q.  And that has been the case throughout the time he has

23  been hospitalized and on all the occasions when you have examined

24  him, correct?

*11:02:45*  25      A.  That's correct.  He's not quite as animated about, you

**OFFICIAL TRANSCRIPT**

1  know, telling me why he doesn't have a mental disorder as he was

2  when I first evaluated him.  He was very forceful about it.  This

3  time he was much more pleasant when we were discussing it, but he

4  still said, "I know that's what y'all believe but I don't believe

*11:03:07*  5  I have one."

6      Q.  And the big problem with that and the reason it's a

7  risk, is that he's ambivalent to his need to take medication; is

8  that right?

9      A.  Yeah.  I think it would be similar to if you really

*11:03:19*  10  don't believe you have high blood pressure, you're not likely to

11  take your high blood pressure medication or any other medication.

12  If you don't think you have a disorder that needs to be

13  corrected, it's hard to convince someone to take the medication

14  for it.

*11:03:32*  15      Q.  He has a history of refusing medication at the

16  institution, correct?

17      A.  He does.  I would say that -- you know, we put him in

18  the category of, you know, not resistant to take it now.  He

19  takes it, and he's not resistant to take it, but he really

*11:03:49*  20  doesn't understand the connection.

21          So we do this thing called the COT readiness profile of

22  when somebody is ready to go into the community.  One of the

23  things we look at is does the person know why they're taking the

24  medication?  Do they know it's to clear their thoughts or to make

*11:04:08*  25  them think more clearly or that kind of thing?  And I still

**OFFICIAL TRANSCRIPT**

1    didn't see him get that connection.

2         Even some people say, "Well, I don't want to take it,

3    but I do notice that when I take it, I don't hear as many

4    voices."  But I still didn't get a good connection the last time

11:04:23  5    I evaluated him.

6         Q.    I think you noted in your report -- tell me if I'm

7    wrong -- that even as recently as February of 2016 he was

8    overheard telling his mother on the phone that if he got

9    released, he was going to stop taking his medicine, correct?

11:04:39  10         A.    Yes.

11         Q.    Even though he had been taking it voluntarily at the

12    institution, he tells his mom on the phone that he's not going to

13    do that when he gets out?

14         A.    Right.  And that's why you would want him to be on a

11:04:49  15    monthly injection or something that you wouldn't have to monitor

16    him taking pills every day.  You'd want him on a monthly shot.

17         Q.    Then months after that when he was overheard, he

18    actually refused his medication at the facility in September of

19    2016.  Do you recall that?

11:05:07  20         A.    Yes.

21         Q.    So this problem hasn't disappeared, the idea of him

22    refusing to take medication, has it?

23         A.    No.  I would say it hasn't disappeared.  And, you know,

24    part of the recommendation for maybe shooting for another year is

11:05:24  25    that some of these -- you know, some of the sort of partial

**OFFICIAL TRANSCRIPT**

1 insights that he's at least discussing with me this time haven't

2 really been reflected in the record for long enough to say, "Hey,

3 this is something solid that he's going to agree to now."  You

4 know, it's more of a waxing and waning.

*11:05:44*

5        But I would say he's -- you know, he's less vociferous

6 and less adamant about not taking medication altogether as he was

7 in the past, but you wouldn't call him fully compliant by any

8 stretch of the imagination.

9    Q.    And even after the risk assessment in 2017, which

*11:06:04*

10 recommended his release, he has -- even after that, in 2018, he

11 has missed a number of his medication management appointments

12 with his psychiatrist at the institution, correct?

13   A.    That's correct.  So that's another indication that he's

14 not, you know, sort of fully compliant or fully onboard.  That

*11:06:25*

15 it's not important to him, you know.

16   Q.    It may be kind of obvious, but could you explain the

17 risk that there is if he stops taking the medicine while on

18 release?

19   A.    Well, you would -- when you look at the literature with

*11:06:41*

20 schizophrenia, if you stop taking the medication and you have the

21 kind of history that he has, we would expect within, you know, a

22 couple or three months that he would start becoming more and more

23 paranoid.  And these ideas that have been, you know, tamped down

24 a little bit would start coming to the surface.

*11:07:00*

25        And if you've been taking medication for this long and

**OFFICIAL TRANSCRIPT**

1    you stop taking it, almost for sure within six months or so

2    you're going to have full-blown symptoms again.

3            Now, some people will have a delay when those symptoms

4    come back.  Sometimes they stop medicine and they get symptoms in

5    a week and sometimes they gradually come back over time.

6            But it would be highly unlikely that if he stopped

7    taking medication, that he wouldn't be back somewhere close to

8    where he was when he first started taking the medication.

9        Q.   Meaning he would be a danger to others --

10       A.   Definitely.

11       Q.   -- in the community?

12       A.   He has to be on medication.  There's no way around

13   that.

14           THE COURT:  What does that person -- I'm sorry.

15           There was somebody on the screen doing something.  I

16   don't know what they were doing.

17   **MS. JONES:   (CONTINUING)**

18       Q.   You also mentioned, as a risk factor, that it's only

19   recently that Mr. Palmer has said that he recognizes that he's

20   not permitted to possess a firearm.  Correct?

21       A.   Yes.  And there's a question of whether he thinks

22   that -- whether he believes he legally -- I think at some level

23   he believes he can legally do that, that he should be able to do

24   it, but he knows he can't do it.  So there's an idea -- I think

25   before he thought he could.  Even though he had some concept that

**OFFICIAL TRANSCRIPT**

1  it wasn't legally right, I think he's acknowledged that, you

2  know, he knows that he's not supposed to have it.  But he thinks

3  it's okay to have it.  Legally he may know that he's not supposed

4  to have it, but he thinks it's okay.

*11:08:37*

5         But he said he will not possess a weapon.  He was

6  pretty adamant about that -- "I will not do that," and "I can't

7  do that," and "I'll get in trouble with that" -- in this last

8  interview, much more than the previous ones.

9     **Q.**   So there's two different questions:  Does he have an

*11:08:54*

10  intent to possess a weapon and does he believe he's legally

11  entitled to possess a weapon.

12     **A.**   Right.

13     **Q.**   So for some time now he's been saying he has no intent

14  to possess a weapon, but at the same time he said he was legally

*11:09:06*

15  permitted to possess a weapon, right?

16     **A.**   That's correct.

17     **Q.**   And then when you interviewed him in May of this year,

18  he even backed off of that second part?  He said, "I understand

19  I'm not even permitted to have a weapon"?

*11:09:18*

20     **A.**   Yeah.  I mean, I really don't think that he believes

21  that.  I mean, deep down I don't think he believes it.  But he's

22  basically saying, "I'm not going to do it.  I know I can't do it

23  and I'm not going to do it, because that would obviously present

24  problems and I would be right back in the situation I was in

*11:09:36*

25  before."

**OFFICIAL TRANSCRIPT**

1       So he was adamant about it.  Whether he really believes

2  that his constitutional right to possess a weapon is no longer

3  valid because of the -- because he's been in the hospital -- I

4  think he's always maintained that these are invalid charges and

*11:09:54*  5  everything is invalid about the whole process.  So I would find

6  it hard to believe that he would really think that he could not

7  legally possess one.

8       So that's why you really need that close monitoring, is

9  because you're not going to -- you either leave him there or

*11:10:08*  10  close monitor him, one of the two, because you don't really know

11  at some level what he's thinking.

12       I mean, as doctors we're always interviewing people and

13  getting a read for it, but, you know, this happens all the time

14  with our guys where we think, okay, they are ready to go.  And

*11:10:25*  15  then, you know, we give them a little rope, and, you know, they

16  get in trouble.

17       So that -- I don't think he really completely believes

18  that he doesn't have a legal right to possess a weapon, but he's

19  saying pretty adamantly that he won't.

*11:10:42*  20  **Q.**   Is it your understanding that he's just saying that

21  because he knows that's what he needs to say in order to get

22  released?

23  **A.**   You know, I'm not -- I would love to be able to read

24  minds, because people think I can, but I can't, so you just have

*11:10:55*  25  to take the more -- I think the more defensive or cautious

**OFFICIAL TRANSCRIPT**

1   position in that situation.  You say, "Okay.  Well, I understand

2   that's your position right now, but we're going to, you know,

3   verify that regularly wherever you are, that you don't have one,

4   that you're not trying to get one."  You know, all that stuff.

5   *11:11:15*        So, you know, it's very important that that be

6   monitored, you know.

7        Q.    Now, the most recent risk assessment report, he was

8   interviewed, in connection with that, in November of 2017.  Does

9   that sound about right to you?

10  *11:11:32*   A.    That's about right.  Towards the end of 2017.

11       Q.    Even at that time, he said he still believed that he

12  was permitted legally to possess a firearm, correct?

13       A.    Yes.

14       Q.    Just a few months before you interviewed him?

15  *11:11:47*   A.    Right.

16       Q.    And that has been consistent throughout his

17  hospitalization, that he has said he's legally permitted to

18  possess a firearm?

19       A.    Yeah.  You know, when we were -- I did talk to the

20  *11:11:58* treatment team before I interviewed him, because I wanted to get

21  a feel for what they're thinking.  And, you know, the head

22  psychologist said that he had had some pretty candid talks with

23  him about, "Look, if you maintain you can possess a weapon and

24  you're going to possess a weapon, this is going to be your home

25  *11:12:14* for the rest of your life."

**OFFICIAL TRANSCRIPT**

1    So it could be that he's just -- you know, he's just

2    saying now, "Well, I'm not going to do that," but may have

3    intentions later on.  Or he could slip later on, or, you know,

4    get sicker later on, and think, okay, well, I'm going to go and

5    try and find something to protect myself with.

6    Those are all possibilities.  And they are concerns

7    just because of the way he has dealt with weapons in the past,

8    you know.  And -- so I think it's just one of those things that

9    you just have to, you know, verify and monitor very closely if,

10    you know, the Court feels comfortable with him going to a group

11    home.

12    THE COURT:  By the way, I'm looking at the Annual Risk

13    Assessment, which is Exhibit 2, dated November 2, 2017.  And the

14    report was prepared by a psychologist.  The panel members

15    included an advanced care level psychologist, another advanced

16    care level psychologist, and a staff psychologist.

17    Do you know if there was a medical doctor, such as a

18    board-certified forensic psychologist or psychiatrist, on that

19    panel?

20    THE WITNESS:  I don't think there was.

21    And I do know that the -- with -- his lead

22    psychologist -- or the lead was typically on the prior review

23    panels but wasn't on this particular one.  I think he was on

24    vacation.  So he wasn't on this particular one.  I think he noted

25    that during the evaluation.

**OFFICIAL TRANSCRIPT**

1    But I'm not sure if they have regular MDs on their
2    review panel process or not.  I don't know if that's part of what
3    they do at that facility.

4    I know there has been a move within the federal system
5    to have more Ph.D.s and less MDs.  They may not be as available.
6    But I don't know about whether they would always put an MD on
7    their panel or not.

8    THE COURT:  I guess one of the points is there was no
9    signature by any MD on the report, correct?

10    THE WITNESS:  I didn't see one.

11    THE COURT:  All right.  Go ahead.

12    MS. JONES:  Thank you, Your Honor.

13  **MS. JONES:  (CONTINUING)**

14    **Q.**   Dr. Thompson, when you mentioned the idea of the
15    firearms possession was particularly concerning because of his
16    past behavior, that would include the idea that he purchased a
17    firearm after indicating at Butner, in 2003, that he had no
18    interest -- or 2004, I'm sorry -- that he had no interest in
19    doing that when released from Butner.  Is that right?

20    **A.**   Yeah.  And he had to check off in the form that he had
21    never been in a mental facility.

22    Now, part of him checking that off could be that he
23    believed all the charges are false so he didn't really believe he
24    was in a mental facility or whatever.  That's a possibility.

25    But in any event, he didn't check off the form that

*11:13:52*
*11:14:07*
*11:14:14*
*11:14:38*
*11:14:51*

**OFFICIAL TRANSCRIPT**

said "I have a mental illness" because he doesn't think he has

one.  Or he may have just been trying to get a weapon, and knows

that he has to check -- you know, the ones that he checks that

are going to cause problems, and doesn't check those, which

*11:15:06*  anybody can do when they're going to purchase a weapon.

Q.    And then Judge Africk mentioned Joint Exhibit 14, which

was the report about dangerousness which concluded that he wasn't

dangerous back in 2004.  And you read that report, correct?

A.    I did.  And I think it's been a while, because I read

*11:15:29*  it between my first evaluation and my second evaluation.  I may

have reviewed it again this time.

Q.    And on Page 4 of that report it's indicated that, about

his 9mm confiscated by the police, he said, "I could care less if

I get it back," and he had no plan to purchase another weapon."

*11:15:49*  A.    Right.

Q.    And yet weeks after he was released from the facility,

shortly thereafter, he did, in fact, go to the pawn shop and get

another firearm?

A.    That's correct.

*11:15:59*  Q.    Another 9mm.

A.    So that has to be taken into consideration with his

present statement that he doesn't want to have a weapon ever,

so...

Q.    Now, another one of the risk factors that you have

*11:16:12*  mentioned is his fixed false belief about his entitlement to

**OFFICIAL TRANSCRIPT**

1  millions of dollars from some sort of judgment?

2       A.   Yes.

3       Q.   Is that right.

4            And that is despite him being on medication

5  consistently over these years since 2010 when he was admitted to

6  Rochester, correct?

7       A.   That's correct.  I don't think that one is going away.

8       Q.   And so why is that of concern, that he continues to

9  maintain that belief?

10      A.   Because I believe that that is what drove all of the

11 behavior with his interaction with law enforcement.

12           So, I mean, I think part of the reason why he had his

13 first threat towards the marshal, and all that, is the delusion

14 that he's owed this large amount of money.  He's trying to go

15 through a court mechanism in order to try and get that money, but

16 doesn't really understand the proper court mechanism to go to, to

17 find it, because it's not there.

18           But he's convinced it's there.  And he's still

19 convinced it's there.  That he's owed -- he's told me $3 million

20 on certain times and I think $1 million another time.  But

21 believes he's owed a substantial amount of money.  And that

22 somehow something happened in the court system that made that

23 money go away.  Or someone took it.

24           He's maintained at times that it was judges that were

25 preventing him from it.  Another time it was the attorney general

**OFFICIAL TRANSCRIPT**

1    or somebody that had done something to where he didn't actually

2    get the money that he was entitled to.

3         This is not an uncommon delusion in people with mental

4    disorders.  And so with people with bipolar disorder, you will

5    see it all the time, where they think they own Microsoft or

6    whatever and -- or they own some big company or they are entitled

7    to millions and millions of dollars, and it's not the case.

8         So I think that one has been fleshed out to where it's

9    pretty clear that the money is not owed to him but he's convinced

10    that it is.

11         THE COURT:  Doctor, with respect to whether he will

12    really utilize the legal system, as he says, go through an

13    attorney to collect his money judgment that he has a delusion

14    about -- with respect to whether or not he will really obtain a

15    gun, since he thinks he should legally be entitled to one --

16    although he understands the consequences, is my understanding.  I

17    mean, all we have is his word on those two areas; is that

18    correct?

19         THE WITNESS:  Yes, that is correct.  So, I mean,

20    it's -- you know, you're basically relying on his statement that

21    he's going to go -- he's going to go through the proper channels.

22         Because I did talk to him about that, "Are you going to

23    go through proper channels?  Because last time you didn't go

24    through proper channels, that's why you're here."  "Well, I'm

25    going to go through proper channels."

**OFFICIAL TRANSCRIPT**

1        But I don't know that it's going to be -- the concern
2  about that is what lawyer is going to take that on?  You know,
3  so...
4        THE COURT:  It also appears to me that his words would
5  be more credible if he, in fact, believed that he was not legally
6  entitled to have a -- possess a firearm and if he really believed
7  that he was not entitled to this money judgment.  It seems like
8  his responses would be more credible if he had taken -- if he
9  had -- if he had taken those steps and believed those two things
10 I just mentioned, but he hasn't.
11       THE WITNESS:  I think that's correct, Your Honor.  He
12 would -- you know, if he didn't have these sort of fixed false
13 beliefs, we wouldn't be here.  But, you know, they are there and
14 so we have to try and sort out, you know, what's the level of
15 credibility.
16       Now, he hasn't attacked anyone at the facility or tried
17 to do anything at the facility, but when he gets out, these
18 things are going to be confronting him again that he's going to
19 want to deal with.
20 MS. JONES:  (CONTINUING)
21   Q.   So let's say he gets out and tries to pursue this
22 judgment in the proper channels, by going to some law
23 enforcement, going to a judge, going to a lawyer.  What will
24 happen when he is unsuccessful at collecting this money that he
25 thinks he's owed?

**OFFICIAL TRANSCRIPT**

1    **A.**    I think, you know, based on what has happened in the

2    past, he may have some level of frustration about that.  And then

3    the concern would be would he sort of escalate the process?

4        So let's say he goes to a lawyer and says, "Hey, I want

*11:20:43*    5    you to get this money for me," and the lawyer does his due

6    diligence and looks into it and goes, "Well, there isn't any so

7    I'm not going to do it."

8        And he goes to lawyer number two or lawyer number three

9    and they all say, "Hey, there really is no money there."

*11:21:00*    10    Then the next step would be he would have to go to a

11    higher level in order to deal with it, and I think that's the

12    concern.  Would he just kind of say, "Okay, I give up.  I've

13    tried this a bunch of times and I just need to not deal with it?"

14    Or would he go then to the next level.

*11:21:16*    15    And, you know, we're assuming, on medication, that

16    maybe he wouldn't go to the next level, but we don't know that.

17    **Q.**    We were talking about his history of refusing

18    medication, being noncompliant.  Even if he stays on the

19    medicine, is it your opinion that he's a danger because of this

*11:21:36*    20    fixed false belief about the money he's owed?

21    **A.**    Yeah.  You know, medications tamp down the symptoms,

22    but they don't make those go away.  So the two delusional

23    symptoms that we've talked about are the ones that are risk

24    factors for him.

*11:21:52*    25    So they're always going to be a concern.  They are not

**OFFICIAL TRANSCRIPT**

1  ones that will go away just because he's taking medication.

2      Q.   And I think you said that he's -- you're saying that

3  he -- it's not going to go away, these delusions?  You don't see

4  it going away ever for him?

*11:22:09*

5      A.   Well, it's 18 years.  I mean, some medications take --

6  schizophrenic medications or medications to treat psychosis can

7  work really slowly.  And so, you know, that's the problem with

8  people moving in and out of the hospital all the time nowadays is

9  sometimes it takes up to two years for them to be fully

*11:22:29*

10  effective.

11      But if he's been taking it for more than two years and

12  the symptoms are still there, the chances of those symptoms

13  completely going away are pretty slim.

14      THE COURT:  Of course, on top of all this it appears,

*11:22:40*

15  to the Court at least, that at this stage you want to tamp down

16  his symptoms, but that's even more difficult to do if there's a

17  question about whether someone will remain compliant with the

18  medication regimen?

19      THE WITNESS:  Yes.  So if you have to go to -- to try

*11:22:56*

20  and control the risk, you know, we do that with longer-acting

21  medications.  But, you know, if he's out from a group home over

22  time or if he's in a -- he has to show up for the shot at least

23  once a month even though -- you know, taking pills is much more

24  complicated.  So we try to make it where compliance is easier,

*11:23:16*

25  but it's not perfect.

**OFFICIAL TRANSCRIPT**

1    MS. JONES:    (CONTINUING)

2        Q.    Now, I think you already mentioned that for a

3    schizophrenic, symptoms wax and wane over time?

4        A.    Yes.

11:23:26    5        Q.    So you don't want to look at a picture of him -- just a

6    little snapshot of him, and conclude that that is how he will

7    look when he gets out; is that right?

8        A.    You can't really do that.  It's more of a -- I always

9    tell folks you have to look at the longitudinal -- you don't want

11:23:42   10    to do what we call a cross-sectional.  If you chop the tree and

11    take one piece of the tree, that's all you are seeing.  So you

12    want to look at the whole tree.

13            Definitely all these longitudinal risk factors are

14    important, and they're always important when we're trying to

11:23:57   15    develop a risk management plan.

16        Q.    Over his history of institutionalization, he has had

17    his hallucinations come and go over time, correct?

18        A.    Yes.

19        Q.    Even though he wasn't reporting any hallucinations to

11:24:11   20    you when you met with him?

21        A.    Right.

22        Q.    I believe he did still report some hallucinations in

23    late 2017?

24        A.    Yes.

11:24:20   25        Q.    He also has reported other delusions aside from the

**OFFICIAL TRANSCRIPT**

 1  money judgment delusion during the time when he has been in the

 2  hospital, correct?

 3      A.   Yeah.  I would -- there's probably a dozen or so over

 4  the years, I would think, that popped up.

 5      Q.   Within the past few years, in May of 2015, he said he

 6  was not taking showers because angels had told him the water was

 7  poisonous?

 8      A.   Yes.

 9      Q.   And in December of 2016 --

10           THE COURT:  When was that, May of what?

11           MS. JONES:  May of 2015, Your Honor.

12  MS. JONES:  (CONTINUING)

13      Q.   And then in December of 2016, he had developed a new

14  delusion about his daughter not actually being his biological

15  daughter; that there had been DNA tests to prove that she wasn't

16  his daughter?

17      A.   Yes.

18      Q.   And then sometime before both of those delusions -- I

19  don't recall the year -- he had begun taking hour-long showers

20  five times a week because he was convinced that he wasn't clean,

21  and I believe that was also based on voices of angels.  Is that

22  right?

23      A.   Yes.

24      Q.   And so it's important -- looking at his progress over

25  the past few years, even though he has progressed, he's still

**OFFICIAL TRANSCRIPT**

1  showing significant symptoms that come and go and change with
2  time?
3      A.    Yeah, they do.  And some are -- they were more severe
4  in the past.  I mean, the first or second time I evaluated him,
5  he had lost 40 pounds because he was afraid the food was poison.
6  So this is kind of another theme that will crop up from time to
7  time.
8          So we see that in the treatment of individuals.  Just
9  as, you know, you may be taking a certain blood pressure medicine
10  and then all of a sudden your blood pressure peaks and you go,
11  "Well, what the heck has happened?"  You go in and say, "I'm
12  taking the medicine and that one is not working."  So you may
13  have to switch to a different one or you may have to add
14  something or make a change or whatever.
15          The same thing happens with patients with
16  schizophrenia.  Their symptoms wax and wane and can go up and
17  down over time.
18      Q.    One of the risk factors that I don't think you
19  mentioned so far is what appears to be a lack of a consistent
20  support system for him; is that right?
21      A.    Well, I would say that his mom has kind of come into --
22  on and off into the picture, but I wouldn't consider that -- you
23  know, she's not regularly involved with his care from what I can
24  understand in talking to the staff up there.
25          So she does check in on him from time to time, but I

11:25:53
11:26:08
11:26:22
11:26:37
11:26:56

**OFFICIAL TRANSCRIPT**

1    don't think he has sort of regular visits or regular reports.  I

2    can't recall that specifically, though.  Maybe if the folks from

3    Rochester could comment about that.  They might have a better

4    idea whether she communicates with them regularly or he talks to

11:27:12    5    her regularly.

6        Q.    And I think we can see in -- and I can find the

7    reference for the Court later, but in the most recent risk

8    assessment in December of 2017, the risk panel reported that he

9    had not had any contact with either his mother or his daughter in

11:27:30    10    quite some time.  Do you remember that?

11        A.    Now that you bring it up, yes, that's true.

12        Q.    The recent risk assessments also mentioned that there

13    was a risk because he had poor psychosocial adjustment?

14        A.    Uh-huh.

11:27:44    15        Q.    Can you explain what that means?

16        A.    I don't know exactly what they're referring to there,

17    but probably just his interaction with peers is pretty limited.

18    He's not, you know, a social person.  He tends to like to be by

19    himself more than he likes to be with other folks.  And so, you

11:28:05    20    know, how he's adjusting to his environment.

21            And I think that was true probably when all this was

22    going on, too.  He had pretty limited interactions; didn't really

23    have a big social circle.  And that, again, is a common symptom

24    with people who have chronic mental illnesses is that they don't

11:28:23    25    really have a big social circle for lots of reasons.  I mean, you

**OFFICIAL TRANSCRIPT**

1  know, if you say, "Hey, there's martians talking to me," people

2  don't really want to talk to you sometimes.

3      Or if you -- just your interactions with other people,

4  if you feel paranoid when other people are talking to you or you

11:28:39  5  feel they might have ulterior motives, you tend to pull back from

6  them.  So they have limited social interactions in general.

7      Q.  Would that mean that his transfer from the institution

8  where he's been for so long to an entirely new environment would

9  be a source of distress for him in and of itself?

11:28:58  10      A.  It can be.  So when we move people from the inpatient

11  setting when they're more comfortable there, and they go to group

12  home settings, they oftentimes have a higher level of restriction

13  on them just because they're in a new setting and they're -- like

14  if he goes from where he is now, which is a pretty open setting,

11:29:17  15  to the group home that's on Level 1, he'll have some adjustment

16  with that because there would be tighter controls on him on what

17  he can do and what he can't do.  You know, you just have to see

18  how they do in that kind of setting and kind of adjust.

19      But at times we'll have problems with that.  People

11:29:35  20  will go out and they will have to come back in because they don't

21  adjust well to the group home setting.

22      I tell people, you know, we have these transition

23  things in this state, but 30 percent of the people will come

24  back -- go backwards once we move them out, because they can't

11:29:51  25  handle being out for whatever reason.  So that's why you have to

**OFFICIAL TRANSCRIPT**

1  be real vigilant when you do move them out.

2      Q.   Now, I think you said that the fact that he had not

3  been consistently violent in the hospital did not mean he was not

4  a risk when moved into a community setting, correct?

11:30:12
5      A.   Right.  Because the -- you know, the structured

6  environment of the hospital is one of those -- one of the things

7  that can help folks.  When they're in an environment that's not

8  high expressed emotion, or -- you know, there was a lot of

9  literature about that 10 or 15 years ago, that homes that had

11:30:33
10  high expressed emotion or people that got real emotional or

11  freaked out about one thing or another, that it tended to make

12  people with schizophrenia get worse versus a more calmer

13  environment.

14          So a setting where he's comfortable, and all that, is

11:30:48
15  going to be easier for him to function in than one where he's

16  not.  But it doesn't mean that you would never want to give that

17  a try, obviously.  But he will have a transition.

18      Q.   But it doesn't tell you he's not dangerous just because

19  he hasn't been fighting with the other patients?

11:31:03
20      A.   No.  Because there's no -- there's hopefully no guns at

21  the hospital, you know, and so the biggest risk factors aren't

22  there.  And it's very difficult to obtain, I would assume,

23  weapons in a federal correctional center, so, you know, his

24  biggest risk factors are not necessarily there.

11:31:22
25          He can't readily, you know, get access to alcohol.  You

**OFFICIAL TRANSCRIPT**

1  know, he's got medication.  People are going to encourage him to

2  take medication, or, you know, force medication if necessary.  So

3  it's a big difference from inside the hospital than outside of

4  the hospital.

*11:31:39*  5      Q.  Now, I'm correct that it's your opinion that Mr. Palmer

6  would pose a substantial risk if released to the community

7  without conditions, right?

8      A.  Oh, there is -- yeah.  He would definitely pose a

9  substantial risk if he was -- without conditions.

*11:31:57*  10      Q.  Absolutely, right?

11      A.  Yes.

12      Q.  And do you see that as ever changing --

13      A.  No.

14      Q.  -- for him?

*11:32:03*  15      A.  No.

16      Q.  Now, let's talk conditional release.  You already said

17  he would pose a substantial risk if he were released on the

18  current plan that the BOP has developed, correct?

19      A.  Yes.

*11:32:16*  20      Q.  And that's basically because the facility isn't

21  adequate, in your view?

22      A.  Well, it's really not designed to do this.  It's a

23  group home that's designed to take care of people that are

24  compliant with medications, they are doing what they are supposed

*11:32:31*  25  to do, and are easy to take care of.  It's not designed for

**OFFICIAL TRANSCRIPT**

1    complicated forensic patients.

2        And so, you know, if you are going to design your group

3    home and you're saying, "Yeah, I'll take care of mentally ill

4    people," that's a broad brush.  And so part of the reason why I

11:32:47  5    wanted to investigate it is to know, you know, is this a place

6    that we would normally send folks or that the federal system

7    normally sends folks?  And do they have those protections in

8    place?

9        THE COURT:  The defendant is a complicated forensic

11:33:01  10   patient.  Is that your medical --

11       THE WITNESS:  Definitely.

12       THE COURT:  So I have -- I want to share this with you.

13   After hearing from you, what you wrote, and reading the Rochester

14   report, I have some issues with respect to Rochester's plan to

11:33:20  15   house him initially to Starting Over 504.

16       THE WITNESS:  Yeah.

17       THE COURT:  And there was a proposed release plan which

18   included that in the recent risk assessment report from

19   Rochester; is that right?

11:33:34  20       THE WITNESS:  Yes.

21       THE COURT:  This plan group home they suggested was an

22   unlocked, non-forensic group home; is that correct?

23       THE WITNESS:  Yes.

24       THE COURT:  And you determined that was not appropriate

11:33:42  25   even though it was suggested by the clinical team at Rochester;

**OFFICIAL TRANSCRIPT**

1   is that correct?

2          THE WITNESS:  Yes.  And I did discuss that with them

3   before I interviewed him, and talked a little bit about it.  And

4   so -- and I think that, you know, basically since they are

11:33:58   5   releasing people all over the country, they -- I don't think they

6   can do just -- well, they may.  They may have a person that can

7   go out and look at it and say if this is an appropriate group

8   home or not.  But I don't think that had occurred.

9          THE COURT:  All right.  Well -- and I think you've

11:34:16   10   expressed the reasons why you don't think that the 504 facility

11   would have been an appropriate facility.

12          THE WITNESS:  Yes.

13          THE COURT:  As a matter of fact, you indicate in your

14   report that the group home would elevate a substantial risk of

11:34:26   15   bodily injury to a dangerous level; is that right?

16          THE WITNESS:  Yes.

17          THE COURT:  At that particular group home?

18          THE WITNESS:  Yeah, because of him not being able to be

19   monitored closely enough.

11:34:34   20          THE COURT:  And as you stated, whether it be because of

21   lack of funds or personnel or whatever, they never did an

22   inspection of this group home; is that right?

23          THE WITNESS:  I don't believe they did.  You would have

24   to ask them directly, but I don't think they did.  I didn't get

11:34:48   25   any indication that they were able to inspect it.  And that

**OFFICIAL TRANSCRIPT**

1    seemed to be a limitation from the social worker, that in general

2    they don't have as much information about various group homes

3    around the country as they would like.

4              THE COURT:  Am I'm correct that you have a firm opinion

*11:35:01*    5    that the defendant is a high risk if he's not in a structured

6    setting?  Is that right?

7              THE WITNESS:  Yes.

8              THE COURT:  Did you not indicate -- not in your report,

9    but did you not indicate to the Court that the lead person in

*11:35:13*    10   charge at night at this particular facility had been a mentally

11   ill person?  Is that right?

12             THE WITNESS:  Well, I think what they do is graduate

13   folks to a certain level, and then whoever is the most advanced

14   person is there at night monitoring things and letting other

*11:35:30*    15   individuals know.  But I don't think they have 24-hour

16   round-the-clock nursing care or 24-hour round-the-clock social

17   work care.

18             THE COURT:  Now, when you expressed your concerns with

19   Rochester about this 504 facility, Rochester -- when I say

*11:35:44*    20   "Rochester," I mean the personnel at Rochester -- agreed with

21   your evaluation; is that right?

22             THE WITNESS:  Yeah, I didn't get any pushback on that.

23             And because I had made some suggestions that other

24   places might be able to be looked at that have more experience at

*11:36:00*    25   that particular -- with that particular, you know, follow-up, and

**OFFICIAL TRANSCRIPT**

1    that they were more forensically oriented.

2              THE COURT:  So a significant concern, to be quite

3    candid, that the Court has is that, whether it be because of lack

4    of funds, lack of personnel, or lack of initiative or whatever,

5    it just doesn't appear to the Court that Rochester did its

6    homework, and it was ready to go ahead and place him in a home

7    which would have been unsuitable for him.

8              THE WITNESS:  Well, I mean, that's the Court's opinion.

9    I understand why.

10             THE COURT:  Do you disagree with that opinion?

11             THE WITNESS:  No.

12             THE COURT:  Yes, sir?

13             MR. UPTON:  Well, she's still asking questions.  I just

14   wanted to address that issue.

15             THE COURT:  I'm going to allow you to follow up on

16   everything.

17             MR. UPTON:  My information, from speaking with the

18   facility at Rochester, and from speaking with Daryl Naquin, who

19   is the probation officer here, and then from speaking with the

20   people at 504, is that as it currently stands, it cannot meet the

21   conditions that Rochester -- the Rochester risk assessment team

22   had required in order for the placement there.  So at this time

23   that place is not an appropriate facility.

24             THE COURT:  But my point is it wasn't until they spoke

25   with Dr. Thompson, and his staff doctors did their independent

**OFFICIAL TRANSCRIPT**

1   research, that we found out that Rochester now believes 504 not

2   to be an appropriate facility.  Because if you look at their risk

3   assessment of what their plan of action was, they very much

4   thought that 504 would be an appropriate placement facility when

11:37:45   5   it wasn't.

6          MR. UPTON:  Well, that was due not necessarily to its

7   inability to be an appropriate facility, but it was because of

8   changes at the facility that had occurred.  There was a time

9   lapse from when it was evaluated and the placement was

11:38:06   10   recommended, and it didn't comply anymore at that time.

11          THE COURT:  It was never a lockdown facility, was it?

12   504 wasn't a lockdown facility?

13          MR. UPTON:  Dr. Thompson was the one that wanted a

14   lockdown facility.  They did not request a lockdown facility.

11:38:23   15          THE COURT:  Okay.  Go ahead.

16          MS. JONES:  Thank you, Your Honor.

17   MS. JONES:  (CONTINUING)

18      Q.   Dr. Thompson, you have indicated that if there would be

19   a plan that would be adequate for Mr. Palmer's release, it would

11:38:38   20   have to involve a structured forensic group home, correct?

21      A.   Yes.

22      Q.   And by that you mean it would have to be a locked

23   facility, correct?

24      A.   Yes.

11:38:46   25      Q.   It would have to have 24/7 professional staff, correct?

**OFFICIAL TRANSCRIPT**

 1        **A.**    Yes.

 2        **Q.**    And it would need to have experience with forensic

 3    clients such as Mr. Palmer?

 4        **A.**    Yes.

11:39:02    5        **Q.**    And none of those things were things that matched

 6    Starting Over 504?

 7        **A.**    From my independent research, yes, that -- those things

 8    were not in place.  And it was not a facility that commonly took

 9    care of these types of clients.

11:39:20   10        **Q.**    Now, you went over, with Mr. Upton, conditions that you

11    would necessarily require in a release plan for Mr. Palmer, and I

12    know a number of those are set out in your report as well.

13            But I think you clarified, during your direct

14    examination, that one requirement would be that he would have to

11:39:41   15    be on Level 1, the most restrictive level, at a forensic

16    facility, correct?

17        **A.**    Yeah.  Definitely before -- and the Court would have to

18    be notified before he moved past that.  So he would have to be on

19    it for a substantial period of time, and the Court would have to

11:39:57   20    be notified before he moved past that.

21            Because the concern would be that if he just sort of

22    sat there quietly and did what he had to do and took his

23    medication, then he would move through the level system and then

24    gain access to being out in the community again, which I don't

11:40:11   25    think is a good idea given his present condition.

**OFFICIAL TRANSCRIPT**

1     **Q.**   Right.  So that would need to be a stated condition?

2  It has to be a Level 1 most restrictive unless the Court orders

3  otherwise?

4     **A.**   Yes.  Or something to that effect.

*11:40:25*  5     **Q.**   As a component of that Level 1 restriction, is it your

6  opinion that he would need to be prohibited from leaving the

7  facility at all without supervision?

8     **A.**   I wouldn't let him go outside of the facility without

9  supervision.

*11:40:40*  10     **Q.**   Okay.  And you would require that as a specified

11  condition of his conditional release, correct?

12     **A.**   Yes.

13     THE COURT:  At these lockdown home facilities, which

14  aren't federal institutions, are there security guards or

*11:40:58*  15  officers there to go ahead and maintain security if someone tries

16  to, for instance, get out of the locked security?

17     THE WITNESS:  Not typically, Your Honor.  I mean, you

18  would think that that would be necessary -- that that would be in

19  place, but not typically.  So we have -- but we do notify the

*11:41:15*  20  Court fairly quickly, and they can call probation and parole or

21  call the local police.

22     So what they do is have relationships with the local

23  police so if someone goes -- or someone's getting out of the box,

24  they can call and get them there with a rapid response.

*11:41:28*  25     But we don't necessarily have 24-hour security guards

**OFFICIAL TRANSCRIPT**

1  at those places.

2       THE COURT:  So there's nobody to secure a patient if a

3  patient tries to leave a locked facility.

4       THE WITNESS:  Usually the staff engage in securing the

5  patient just like they would during the day.  We don't have,

6  necessarily, security guards at the -- we have people that are

7  trained in security measures, but they wouldn't be security

8  guards carrying weapons like even at the hospital.

9  MS. JONES:  (CONTINUING)

10      Q.   It would be like a tech or something that knows how to

11  help when a patient is getting out of control?

12      A.   Yes.

13      Q.   Do you think that Mr. Palmer will ever reach the point

14  where it would be advisable to let him be on a lower level of

15  security at one of these facilities?

16      A.   I think that would have to be done extremely slowly.

17      So he may reach a point.  I mean, you never know.  When

18  they go to a different setting, they may function better and do

19  better.

20      But I think you would have to really explore his sort

21  of tightly held delusional beliefs and evaluate that as you go

22  along.

23      But just as, you know, they had difficulty predicting

24  that he was not a danger, it's difficult sometimes to predict how

25  people are going to do in different settings.  So I would say

**OFFICIAL TRANSCRIPT**

1    just to be extremely cautious about moving him to a level where

2    he would not be under supervision.

3         Q.   So this is not the kind of case where you would assume

4    from the outset that surely he'll get to a lower level at some

*11:42:53*  5    point?

6         A.   No, I would not assume that.

7         Q.   You recommended both Grace Outreach and Harmony

8    House --

9         A.   Yes.

*11:43:04*  10        Q.   -- as potential facilities that could possibly house

11   and care for Mr. Palmer?

12        A.   That's correct.  Because I know we've used those in the

13   State, and they've been -- you know, they have been successful

14   placements for individuals similarly situated.

*11:43:21*  15        Q.   Can you expand a little bit on your experience with

16   those facilities and the kinds of patients you know that have

17   gone there and what your involvement and experience has been with

18   them?

19        A.   Well, the State saw that there was a need for

*11:43:36*  20   individuals who were in the forensic hospital setting and

21   probably could function in a less restrictive setting, but most

22   group homes were uncomfortable with taking on forensic clients in

23   the state of Louisiana back when we first started looking at

24   this.  And the judges were very uncomfortable with them going

*11:44:00*  25   outside of the locked setting unless there was a particular -- it

**OFFICIAL TRANSCRIPT**

1    was set up programmatically so that it would be -- folks would
2    have a higher level of awareness of what the potential was for
3    these particular individuals.
4            So, you know, we got together with, you know, folks
5    that, you know, had an old nursing home, and we found a provider
6    that was willing to, you know, take on the population.  We talked
7    to the legislators to try and find, you know, a district that
8    would be willing to take on the population.  And we got it all
9    put together, and then we -- you know, I had a lot of oversight
10   in it and developing it programmatically and making sure they had
11   certain pieces in place.
12       Q.    Which facility are you talking about right now?
13       A.    Initially it was Harmony.  Then we heard about Grace,
14   and the fact that they had been running group homes that were --
15   you know, that were felt to be of higher quality.
16           And so we talked to the owner of Grace and said, you
17   know, "Do you think you could take on the forensic population?
18   Would you be willing to do that?"  He said, "Yes, we would be
19   willing to do that."  So we did a similar kind of thing with
20   them.
21           So we have about 85 beds in Baton Rouge at Harmony at
22   two different locations.  And I believe that Grace has
23   approximately 35 right now in the New Orleans area.
24           And so depending on -- from a logistics standpoint,
25   depending on what we need in the state, if we don't want a person

**OFFICIAL TRANSCRIPT**

to be back in New Orleans because that's a high risk for them,
we'll recommend Baton Rouge.  And we can go back and forth.

We're trying to get them in other parts of the state as
well, but, you know, it's very difficult right now to get funding
for that.

So they were developed in order to have a safe stepdown
from the hospital for individuals who didn't need the level of
security in the forensic hospital, and it's a great
cost-effective alternative.  I mean, it costs about a quarter of
what it does to have a person in a hospital bed.

So we have people that we know are never going to get
past the group home level because they have fixed delusions very
similar.  We know they're not going to get past the group home
level, but we know they don't need to be in the full-blown
hospital.  And so, you know, it saves the State a ton of money to
do it that way and it's pretty safe.

The way we do it, we pull them back in if we need to.
But about 70 percent stay out in the group home setting or
graduate to go back into the community.  So it's a pretty safe
alternative if you do it the right way.

Q.    So about how long has each one been operating?

A.    Harmony has been operating for probably maybe 15 years
now.  And then Grace, I would say they've been operating in the
forensic capacity for maybe 10.

Q.    So are the types of clients that they handle comparable

**OFFICIAL TRANSCRIPT**

1  to Mr. Palmer in terms of the seriousness of his mental illness

2  and their history of dangerousness?

3      A.   Yes.  We have all -- we have all kinds of patients

4  there with -- you know, some of them with serious histories.

5  Some of them have had murder charges, or just charges that

6  serious, all the way to folks that, you know, have relatively

7  minor charges but never really got that they were mentally ill so

8  it's hard to treat them.  You know, they're ping-ponging in and

9  out of different systems and they end up in the forensic system.

10         So we have the whole gamut there.

11     Q.   Do you believe that both of those facilities are

12  qualified to maintain security and keep a watch over someone like

13  Mr. Palmer?

14     A.   Yes.

15     Q.   How does the level of restriction and the level of

16  rigidity at those two facilities compare with the federal medical

17  center in Rochester?

18     A.   You know, I mean, the federal -- from what they

19  describe, the federal medical center in Rochester is a pretty

20  open -- they said it looks like a college campus.  I haven't

21  physically visited it.

22         But it's not what you would expect at a -- you know,

23  the more high-security federal systems where they may have

24  individual cells or that kind of thing.

25         So, I mean, they probably would be better to testify

**OFFICIAL TRANSCRIPT**

1    about that.

2              The group home settings at Harmony and at Grace are a

3    little bit different just because of the -- you know, it's more

4    constrained by the building than anything.

*11:48:43*

5              But when they're initially -- like I said, when they

6    initially go on, they will have more restrictions probably than

7    what he has presently at the federal medical center.

8        Q.   And is the Rochester Federal Medical Center the least

9    restrictive of the federal medical centers?

*11:48:59*

10       A.   From my understanding, yes.  I mean, I have been to

11   Butner and I've been to Springfield, and I think I've been to the

12   one in Louisiana.  I'm blanking on the town that it's in.

13             THE COURT:  Jackson.

14       A.   And I'm always at Jackson because that's where I -- I'm

*11:49:17*

15   there at least one day a week.

16             But the one in -- I've never been to the one in

17   Rochester.

18   MS. JONES:  (CONTINUING)

19       Q.   Can we talk a little bit about what would be the

*11:49:27*

20   potential benefits to Mr. Palmer for making the transition from

21   Rochester to a facility like these that you mentioned should the

22   Judge ever order that.

23             I think you've already indicated that his level of

24   freedom would not necessarily be any greater at these homes; is

*11:49:50*

25   that correct?

**OFFICIAL TRANSCRIPT**

1    **A.**    Well, when he's on Level 1, it won't.  However, over

2    time he would progress, and you would assume there would be a

3    natural progression towards Levels 2, 3, and 4 over time.  But

4    that may take -- I wouldn't recommend that right away, obviously.

11:50:06    5        But over time he would have more freedom.  He might be

6    able to -- at Harmony he can get a job.  They can set him up with

7    working outside of the facility and monitoring how he does with

8    that.  So there's lots of different opportunities that might be

9    open to him that wouldn't necessarily be open to him if he were

11:50:27    10    in the forensic hospital.

11    **Q.**    And that would only be if the Court ordered that it was

12    allowable for him to go down a level and possibly get to that

13    point?

14    **A.**    Correct.

11:50:36    15    **Q.**    Do any people in the facilities like Harmony and

16    Grace -- I know you mentioned that many of them stay in a group

17    home setting and don't go into the community.

18    **A.**    Yes.

19    **Q.**    How many of them stay on a Level 1 restriction for the

11:50:51    20    entire time?

21    **A.**    It would be -- there's very few that just always stay

22    on Level 1.  I mean, you know, they usually would graduate to

23    Level 2 within a period of time, you know, and there are some

24    guys that will hover at Level 2 or Level 3 for a long period of

11:51:06    25    time.

**OFFICIAL TRANSCRIPT**

1          And so it just depends on the individual and what they

2   are showing, and what the staff think they are ready for, and the

3   psychiatrists think they are ready for, and they pull them back

4   and forth depending on what symptoms they have.

*11:51:18*

5          Q.   And you did say, as far as Mr. Palmer is concerned,

6   that you don't think he should ever be released to the community

7   from a group home or institutional setting?

8          A.   I think that would definitely increase the risk

9   substantially if that was the case.

*11:51:38*

10         Q.   Do you have any idea whether moving Mr. Palmer to one

11  of these group home facilities would mean that he would be able

12  to see family more than he does at Rochester?

13         A.   I don't know that in particular.  I mean, it obviously

14  would be closer access to his family, you know, so that they

*11:51:58*

15  could come visit him.  His mother could come visit him

16  periodically.  Certainly, if he was at Harmony, it would be a lot

17  closer -- he would be in Baton Rouge -- than compared to going

18  all the way up to Rochester.

19         Q.   I guess given their lack of contact over long periods

*11:52:13*

20  of time, do you know whether that would even happen?

21         A.   I don't have any idea whether that would happen or not.

22  I would assume his mother would see him more frequently than she

23  does now, but I don't know if she would be coming regularly.

24         Q.   I think you also mentioned that it's possible that

*11:52:30*

25  there could be a significant level of distress simply from making

**OFFICIAL TRANSCRIPT**

1    the move from Rochester to a group home facility?

2        A.   Right, that can happen.  And we see it, you know,

3    fairly regularly where they move to -- you know, Harmony more

4    than Grace.  They move to Harmony, and Harmony has some pretty

5    rigid rules and they don't like the rules.  They say, "I just

6    want to go back to the forensic hospital.  It's easier there than

7    at Harmony to follow the rules."

8            It just depends on how they get along with following

9    the particular rules of the facility.

10       Q.   Now, as far as the likelihood that Mr. Palmer will go

11   down to least restrictive levels should he ever go to one of

12   these facilities, he's been institutionalized now for 18 years or

13   so?

14       A.   It's been a while.

15       Q.   And he still is not to the point where you would

16   consider that he should have low -- I'm not thinking of the right

17   words, but that he should be anything other than a Level 1?

18       A.   No, not -- definitely not initially when he leaves the

19   hospital.

20       Q.   What do you think the likelihood is that he will ever

21   get there if he hasn't after all of these years?

22       A.   Well, I mean, all you can do is, you know, give it a

23   shot and see how he does, you know.  At some point in time, you

24   know, we have to look at is it worth it to do that or not.

25           I mean, it may be that the Court looks at this and

**OFFICIAL TRANSCRIPT**

1  says, "I don't think it's worth it to do it."  And he may be on

2  Level 1 for a long time.  But you really have to test how the

3  person does.

4        I mean, at some level there's a level of faith that we

5  all have to have in the process to see how it works, and, you

6  know, we -- just as long as you monitor that closely, you can say

7  it worked or it didn't work.  Or, you know -- and we try and

8  use -- but there's no book on how to do the timeline.  I mean,

9  you know, it's -- we look at the risk factors.  We see where the

10  person is, we look at past patients and how they did, and then we

11  make recommendations.

12        So, you know, I can put together an algorithm.  Even

13  when I put together an algorithm, it's such a tight algorithm

14  that you're not really sure.  One person can score a 17 on a

15  particular risk assessment and they do fine, and another person

16  could score a lot higher and they do worse.  And then the next

17  week you see some guy that scored really low and they bottom out.

18  Overall, you get some idea of who are the guys that have a

19  chance.

20        You know, if he really didn't have these fixed false

21  beliefs, he probably would have a lot better chance, but you just

22  have to take it slow.

23        MS. JONES:  Your Honor, I think that's all I have.  May

24  I have one moment?

25        THE COURT:  Yes.

**OFFICIAL TRANSCRIPT**

| | |
|---|---|
| | (A pause in the proceedings.) |
| | THE COURT:  Mr. Upton, I have just a few questions, |
| | five or ten minutes.  Would you like to follow up after those |
| | questions or would you like to go now? |
| 11:55:35 | MR. UPTON:  Yes. |
| | THE COURT:  All right.  I just have a few questions, |
| | Doctor.  And some of these are repetitive of what you have in the |
| | record, but I want to emphasize those points and hear any other |
| | thoughts you have with respect to them. |
| 11:55:46 | These will all be from Exhibit 1 including the |
| | appendix, at least at the beginning. |

1      (A pause in the proceedings.)
2          THE COURT:  Mr. Upton, I have just a few questions,
3  five or ten minutes.  Would you like to follow up after those
4  questions or would you like to go now?
5          MR. UPTON:  Yes.
6          THE COURT:  All right.  I just have a few questions,
7  Doctor.  And some of these are repetitive of what you have in the
8  record, but I want to emphasize those points and hear any other
9  thoughts you have with respect to them.
10         These will all be from Exhibit 1 including the
11 appendix, at least at the beginning.
12         Am I correct that you stated, looking at Page 4 of
13 your -- of Exhibit 1, that Mr. Palmer continues to maintain he
14 does not think he has a mental illness?  Is that correct?
15         THE WITNESS:  Yes.
16         THE COURT:  And while he's taking medication, he cannot
17 specifically state how they benefited him regarding his thought
18 process; is that correct?
19         THE WITNESS:  Yes.
20         THE COURT:  And he still, as you mentioned, harbors a
21 belief that he's owed money in excess of $1 million; is that
22 right?
23         THE WITNESS:  Yes.
24         THE COURT:  He denies believing that judges are
25 preventing him from obtaining the money, and he reports that once

**OFFICIAL TRANSCRIPT**

1  released he will hire an attorney to help him acquire the money;

2  is that correct?

3            THE WITNESS:  Yes.

4            THE COURT:  And moving on to Page 5, most of the time

11:56:44  5  at FMC Rochester, he has maintained he does not have a mental

6  illness and that he has a right to carry weapons when he leaves

7  the facility; is that correct?

8            THE WITNESS:  Yes, that's my understanding.

9            THE COURT:  But recently he changed his mind on those

11:56:56  10  issues?  And that has been recent, correct?

11            THE WITNESS:  Yes, I would say it's relatively recent.

12            THE COURT:  And he's diagnosed with delusional

13  disorder, persecutory type schizophrenia, chronic paranoid type,

14  and schizophrenia undifferentiated type, by multiple evaluators

11:57:12  15  in multiple settings over the years; is that right?

16            THE WITNESS:  Yes.  It's all sort of what we would

17  consider sort of this schizophrenia spectrum.

18            But all those -- all those would be considered serious

19  mental disorders.

11:57:25  20            THE COURT:  And, of course, he was initially -- with

21  respect to this charge, he was forced to take medication pursuant

22  to this Court's order and affirmed by the Fifth Circuit, cert

23  denied by the U.S. Supreme Court; is that right?

24            THE WITNESS:  Yes.

11:57:38  25            THE COURT:  All right.  And you indicate on Page 8 that

**OFFICIAL TRANSCRIPT**

1  it's clear from the Rochester FMC records that he still does not

2  believe he has a mental illness; is that right?

3        THE WITNESS:  Yes, sir.

4        THE COURT:  He still maintains that the U.S. marshals

5  had no authority to detain him on the day of his arrest; is that

6  correct?

7        THE WITNESS:  Yes.

8        THE COURT:  And his willingness to take medication is

9  an important step forward, but is very recent; is that correct?

10        THE WITNESS:  Yes, I would say that's relatively

11  recent.  It's probably -- he's probably been better with

12  medications than he has with -- or he's been okay with taking

13  them, even though they've been, you know, in the form of a shot,

14  for a little bit longer than this change in the weapon issue.

15        THE COURT:  You indicated he consistently reported at

16  Rochester that he had a right to carry a weapon.  He's only

17  recently changed this long-held belief, and there's some level of

18  concern that recent expressed beliefs may be reported by him in

19  an attempt to get out of FMC Rochester or from a realization that

20  he'll never get out unless he agrees to the condition; is that

21  correct?

22        THE WITNESS:  Yes, that's what I testified to earlier.

23        THE COURT:  And am I correct that on Page 9 you

24  indicate his insight into his mental illness is felt to be poor?

25  Is that correct?

**OFFICIAL TRANSCRIPT**

1        THE WITNESS:  Yeah.  It's pretty much non-existent.

2  "Poor" was a kind word.

3        THE COURT:  And moving on to Page 10, according to the

4  records of Rochester, he reports he does not think he needs the

*11:59:12*

5  medication but takes it because his doctors prescribe it and the

6  Court wants him to take it; is that correct?

7        THE WITNESS:  Yes.

8        THE COURT:  And he still harbors the belief that he

9  does not have a mental illness?

*11:59:20*

10        THE WITNESS:  Yes.

11        THE COURT:  And it's your opinion that he was not

12  attempting to exaggerate his psychiatric symptoms when you

13  examined him, spoke to him, but he's more likely to minimize his

14  psychiatric symptoms than to exaggerate or malinger symptoms; is

*11:59:34*

15  that correct?

16        THE WITNESS:  Yes.

17        THE COURT:  Moving on to the appendix, which is part of

18  Exhibit 1, in 2017 a Dr. Hart -- who is Dr. Hart, H-a-r-t?

19        THE WITNESS:  You know, I don't know all the specific

*11:59:55*

20  doctors that were involved and what their roles were.  Let me

21  just take a look.  I'm familiar --

22        THE COURT:  This is on Page 23 of Appendix I of the

23  Thompson Report.

24        THE WITNESS:  Let me get there.

*12:00:07*

25        THE COURT:  It's Bates No. 004851.

**OFFICIAL TRANSCRIPT**

1              THE WITNESS:  Okay.  Yeah.  I'm not really seeing this
2       on here.  Where are you on the page?
3              THE COURT:  It's right under where it says "l. 2017."
4              THE WITNESS:  Okay.  All right.
5       *12:00:23*       THE COURT:  You mention Dr. Hart right under that.
6              THE WITNESS:  Right.
7              THE COURT:  Is he a psychiatrist or a psychologist, do
8       you know?
9              THE WITNESS:  I'm not sure.
10      *12:00:32*      THE COURT:  Or she.
11             THE WITNESS:  I'm not sure.
12             THE COURT:  Okay.
13             THE WITNESS:  I think it was a psychologist, but I'm
14      not sure.
15      *12:00:37*      THE COURT:  Am I correct that Dr. Hart was concerned
16      that the defendant remains without insight into his mental
17      illness and without proper supervision, he would most certainly
18      discontinue his treatment?  Is that correct?
19             THE WITNESS:  Yes.
20      *12:00:49*      THE COURT:  And their concern was a new delusional
21      system that the defendant was unwilling to discuss, and that had
22      to do with the DNA testing and his daughter; is that right?
23             THE WITNESS:  Yes.
24             MS. JONES:  Your Honor, just for your information,
25      *12:01:02*  Dr. Hart is a psychiatrist.

**OFFICIAL TRANSCRIPT**

1    THE COURT:  Okay.  Thank you.  I appreciate that.

2    Am I correct that on February 15, 2017, Mr. Palmer did

3    not respond for several hours to his assessment; is that right?

4    THE WITNESS:  Yes.

*12:01:17*

5    THE COURT:  And on February 20, 2017, defendant

6    reported he heard voices daily.  They were loud.  That he was

7    used to them, and they were no longer bothersome.  He felt like

8    they were his conscience talking to him or like a voice telling

9    him what is going on; is that right?

*12:01:31*

10    THE WITNESS:  Yes.

11    THE COURT:  And March 9, 2017, it was documented that

12    he denied having auditory hallucinations, schizophrenia, or that

13    he was mentally ill, and he felt he was being falsely imprisoned

14    at FMC Rochester; is that correct?

*12:01:44*

15    THE WITNESS:  Yes.

16    THE COURT:  All right.  And further down we're talking

17    about an annual risk assessment panel convening on March 23,

18    2018, which chronicled this history:  In an interview, Mr. Palmer

19    had a flat affect and he endorsed the same grandiose and paranoid

*12:02:02*

20    delusional beliefs about being entitled to large sums of money

21    and had minimal insight into his civil commitment and no insight

22    into his mental illness.

23    Is that correct?

24    THE WITNESS:  Yes.

*12:02:11*

25    THE COURT:  He indicates he was arrested for no reason,

**OFFICIAL TRANSCRIPT**

1    and that others lied to get his $3 million.  And when asked about

2    why he was entitled to the money, he voiced a disorganized

3    statement about confidential transgressions.

4              Is that correct?

12:02:22    5              THE WITNESS:  Yes.

6              THE COURT:  And according to that history by the risk

7    assessment panel, he felt he was still allowed to possess a

8    firearm, denied having mental or health issues, and described his

9    psychiatric medication as, quote, harmful, unquote.

12:02:34    10              Is that correct?

11              THE WITNESS:  Yes.

12              THE COURT:  And expressed a preference for not taking

13    medication, but he would be open to taking it if he had to.

14              Is that right?

12:02:41    15              THE WITNESS:  Yes.

16              THE COURT:  And if released unconditionally -- this is

17    on Page 24 -- he said he would live at home, stop taking

18    medication unless it was required, and would go to law school in

19    order to protect his rights and get his $3 million back.

12:02:54    20              Is that right?

21              THE WITNESS:  Yes.

22              THE COURT:  And the panel discussed the fact that if

23    Mr. Palmer was released into the community without conditions, he

24    would be unable to remain compliant with mental health treatment,

12:03:05    25    and did not have the ability to care for himself or function

**OFFICIAL TRANSCRIPT**

1    independently.

2            Is that correct?

3            THE WITNESS:  Yes.

4            THE COURT:  And Dr. Hart assessed on May 31, 2017, that

12:03:14    5    the voices of God and the angles -- I guess the angels -- were

6    less frequent, and defendant indicated he missed these sometimes

7    as they were comforting.

8            Is that correct?

9            THE WITNESS:  Yes.

12:03:25    10            THE COURT:  And he conveyed to nursing staff on

11    July 13, 2017, that he had auditory hallucinations of his

12    conscience or God talking to him and telling him what to do.

13            Is that right?

14            THE WITNESS:  Yes.

12:03:36    15            THE COURT:  And that most of the voices were

16    comforting?

17            THE WITNESS:  Yes.

18            THE COURT:  And it was the opinion of the staff on that

19    date that Mr. Palmer continued to suffer from a mental disease or

12:03:45    20    defect such that his release would create a substantial risk of

21    bodily injury to another person or serious damage to property of

22    another, and that was based on the annual risk assessment

23    conducted on March 23, 2017, and signed on July 2017.

24            Is that correct?

12:03:59    25            THE WITNESS:  Yes.

**OFFICIAL TRANSCRIPT**

<pre>
 1            THE COURT:  So that was about one year ago?

 2            THE WITNESS:  Right.

 3            THE COURT:  And am I correct, looking at Page 25, that

 4   on October 11, 2017, he reported to the mental health RN that he

 5   was having auditory hallucinations describing them as background

 6   noises?

 7            Is that right?

 8            THE WITNESS:  Yes.

 9            THE COURT:  The annual risk assessment on November 2,

10   2017, was held, and I think it indicates on the bottom of Page 25

11   of this appendix that those were non-treating psychologists who

12   met to offer the opinion; is that right?

13            THE WITNESS:  Yes, it does.

14            THE COURT:  And we move on to Page 28, towards the

15   middle of the page.

16            It says:  A risk assessment panel on March 23, 2017,

17   confirmed he had maintained minimal insight into his civil

18   commitment and no insight into his mental illness.

19            Is that correct?

20            THE WITNESS:  Yes.

21            THE COURT:  He told panel members he believed he was

22   allowed to possess a gun at the time of his offense, and he was

23   currently allowed to as well, though he denied the desire to do

24   so.

25            Is that correct?
</pre>

**OFFICIAL TRANSCRIPT**

1       THE WITNESS:  Yes.

2       THE COURT:  Again, he denied having a mental illness

3   currently or in the past, felt psychiatric medication was

4   harmful, and openly expressed -- that's in quotes -- openly

12:05:22    5   expressed a preference for not taking the medication though he

6   was, quote, open, unquote, to taking it if he had to.

7       Is that right?

8       THE WITNESS:  Yes.

9       THE COURT:  And the panel agreed his mental illness was

12:05:31   10   closely related to past threatening statements and possession of

11   weapons.

12       Is that right?

13       THE WITNESS:  Yes.

14       THE COURT:  They concluded that despite treatment and

12:05:40   15   medication, he continued to exhibit auditory hallucinations,

16   grandiose and paranoid delusional beliefs, and minimal motivation

17   for treatment due to poor insight.  And it was unanimously agreed

18   that he continued to meet the criteria for commitment.

19       Is that right?

12:05:53   20       THE WITNESS:  Yes.

21       THE COURT:  Now, I'm looking at the bottom of Page 28.

22   What is an "HCR-20 v3"?

23       **A.**  HCR-20 is what we call an actuarial instrument for risk

24   assessment.  And so basically it takes 20 separate categories

12:06:10   25   that you look at for risk and categorizes them.  And then the

**OFFICIAL TRANSCRIPT**

 1  psychologists will typically derive a score from that or derive a
 2  narrative from that.  But it's a way of looking at all the
 3  potential risks when you are doing a risk assessment.
 4          There are multiple different instruments that are used
 5  for risk assessment instruments.  Some of them -- there's the
 6  Hare Psychopathy Checklist and then there's also this HCR-20
 7  which have been designed with research to look at what are the
 8  different risk factors, and does the person fall in a high level
 9  in that particular risk category or not.
10          THE COURT:  And those risks -- that test found that he
11  was -- definitely or conclusively that he had
12  historical/clinical/risk management problems with violence, major
13  mental disorder, treatment or supervision response, and insight.
14          Is that right?
15          THE WITNESS:  Right.
16          THE COURT:  And that notwithstanding all that, on
17  Page 29, it indicates that Elizabeth Meyer, who is a licensed
18  social worker, outlined details for the plan and the, quote,
19  accolades, unquote, of the group home Starting Over 504.
20          Is that right?
21          THE WITNESS:  Yes.
22          THE COURT:  And it also indicates, further down on
23  Page 29, the defendant still expressly denied having a mental
24  illness or any mental health concerns though he was aware his
25  treatment providers felt he had schizophrenia.

**OFFICIAL TRANSCRIPT**

1              Is that right?

2              THE WITNESS:  Yes.

3              THE COURT:  And he had not heard voices, quote, too

4    much lately, unquote, but he'd heard them a lot the previous day

12:07:36    5    in the dining hall.

6              Is that right?

7              THE WITNESS:  Yes.

8              THE COURT:  The voices he believed belonged to angels,

9    but they did not distract him.

12:07:42    10             Is that right?

11             THE WITNESS:  Yes.

12             THE COURT:  And he continued to assert grandiose

13   delusional beliefs about being awarded and owed substantial

14   financial compensation from a previous lawsuit and planned to

12:07:53    15   file a judgment and get an attorney.

16             Is that right?

17             THE WITNESS:  Yes.

18             THE COURT:  And he did not seem to understand that

19   Haldol was prescribed to reduce psychotic symptomology.  He did

12:08:01    20   not believe he was dangerous because he functions well even

21   though he hears voices.

22             Is that right?

23             THE WITNESS:  Yes.

24             THE COURT:  And again, as we mentioned before, Pages 29

12:08:10    25   and 30, he agreed he would not own a firearm, but he did not

**OFFICIAL TRANSCRIPT**

1  understand that was illegal.

2          THE WITNESS:  Yes.

3          THE COURT:  So that would -- does that not indicate --

4  or is it your opinion that he wouldn't own a firearm, but he

5  didn't -- is there a difference between not understanding that

6  something is illegal and understanding that if you do something,

7  there will be consequences?

8          THE WITNESS:  Sure.

9          THE COURT:  Here it indicates he didn't even understand

10  that possessing a firearm would be illegal?

11          THE WITNESS:  Right, that's correct.

12          So I think he still holds the belief that legally he

13  can -- that at some level it's legal for him to possess a

14  firearm, but he's stating that he's not going to do it.  He's not

15  going to possess the firearm because he knows that will get him

16  in trouble.

17          So -- but he does have a belief that he thinks it's

18  legal.

19          THE COURT:  And on Page 30 it indicates that past

20  violence is the best predictor of future violence, and the panel

21  members agreed he was at risk for future violence, particularly

22  during periods of psychiatric decompensation or when he had

23  paranoid beliefs about someone wanting to harm him.

24          Is that right?

25          THE WITNESS:  Yes.

**OFFICIAL TRANSCRIPT**

1    THE COURT:  And his future violence risk was further

2    elevated by his difficulty adhering to treatment and supervision

3    requirements.  It was partially elevated by poor psychosocial

4    adjustment related to interpersonal relationships and prior

12:09:31    5    traumatic experiences.

6    Is that right?

7    THE WITNESS:  Yes.

8    THE COURT:  And this was all in 2017?

9    THE WITNESS:  Let's see.  I think we're still in 2017,

12:09:42    10    yes.

11    THE COURT:  And it also indicates, on Page 30, that he

12    continued to display active symptoms of schizophrenia, most

13    notably ongoing auditory hallucinations, despite consistent

14    treatment.  He lacked insight into his illness and the need for

12:09:58    15    treatment though his guardedness regarding the symptoms suggested

16    that he understood mental health providers viewed them as

17    indicators of mental illness.

18    THE WITNESS:  Yes.

19    THE COURT:  He often missed medication management

12:10:14    20    appointments; is that right?

21    THE WITNESS:  Yes.

22    THE COURT:  That's a red flag as far as whether you

23    will be compliant outside of the facility with medicine?

24    THE WITNESS:  Yeah.  I don't think he has ever really

12:10:23    25    thought he needed medication.  That's pretty consistent with his

**OFFICIAL TRANSCRIPT**

1    behavior and what he's doing and -- but if they force it on him

2    or tell him he has to take it or the Court says he has to take

3    it, he's been willing to take it, but he still is not going to

4    believe that he needs it.

12:10:39    5          THE COURT:  And actually, Doctor, the next statement,

6    which I was going to direct your attention to, at the bottom of

7    Page 30, says:  He had poor insight and believed he did not need

8    psychiatric medication which put him at risk for ceasing

9    medication.  He did understand the medication compliance was

12:10:53   10    required and non-adherence bore serious consequences.

11          THE WITNESS:  Yes.

12          THE COURT:  So his risk of medication non-compliance

13    was considered low.

14          And Page 31 at the bottom has to do with the year 2018.

12:11:16   15          They indicated he was not engaging in the full program.

16          And then we move to Page 31, still 2018.  Again, he did

17    not think he had a mental illness and did not agree with a

18    diagnosis of schizophrenia; is that right?

19          THE WITNESS:  Yes.

12:11:29   20          THE COURT:  He still indicated, on Page 32, that they

21    "falsified me here" regarding his federal crime charge, and

22    reported he will continue to take his medication upon release,

23    though he did not think he had a mental illness, because that's

24    what they want me to do.  He has limited insight.

12:11:44   25          Correct?

**OFFICIAL TRANSCRIPT**

1          THE WITNESS:  Yes.

2          THE COURT:  He refused to participate in any groups

3     other than weekly leisure groups; is that right?

4          THE WITNESS:  Yes.

12:11:51  5     THE COURT:  All right.  I want to move on to

6     Exhibit 10, which I've reviewed.  This is the Bureau of Prisons

7     Psychology Services Clinical Intervention - Clinical Contact.

8          It's from February 20, 2018.

9          THE WITNESS:  Your Honor, do you want me to have a copy

12:12:08  10    of that to look at or not?

11         THE COURT:  Well, do you have another copy?

12         MS. JONES:  I can give him a copy.

13         THE COURT:  If you'd just give him Exhibit 10 and

14    Exhibit 11, that would be helpful.

12:12:21  15    THE WITNESS:  I didn't know if you were going to ask me

16    questions about it.

17         THE COURT:  I only have a few more minutes of this and

18    then Mr. Upton can follow up with anything he wishes to follow up

19    on.

12:12:30  20    THE WITNESS:  Okay.

21         THE COURT:  All right.

22         THE WITNESS:  Mine are, I think, electronic so it's

23    nice to have a real copy.

24         THE COURT:  Yes, sir.

12:12:43  25    February 20, 2018.  The Bureau of Prisons Psychology

**OFFICIAL TRANSCRIPT**

```
 1    Services Clinical Intervention - Clinical Contact.
 2              Progress/plan.
 3              Mr. Palmer will continue to be seen in accordance with
 4    a Care4-MH assignment.
 5              What is that, do you know?
 6              THE WITNESS:  A Care4-MH assignment?
 7              THE COURT:  Yeah.  Care 4 mental health?
 8              THE WITNESS:  Yeah, I guess.  I don't know what that
 9    is -- how they classify that particular assignment.
10              THE COURT:  It indicated:  He has declined recommended
11    treatment consistent with his mental health care level.  That is,
12    weekly evidenced-based therapy.
13              Correct?
14              THE WITNESS:  Yes.
15              THE COURT:  If you go to the next page, which is
16    January 4, 2018, for progress/plan it indicates:  Mr. Palmer has
17    declined recommended treatment consistent with his mental health
18    care level.  That is, weekly evidenced-based therapy.  He will be
19    seen at least monthly.  And it goes on.
20              Is that right?
21              THE WITNESS:  Yes.  That sort of gives you an
22    indication of how people can rise in their level even though
23    they're not doing all the things that they're supposed to be
24    doing.  So we were talking about that before.  That's one thing,
25    if he were going to go to a group home, you have to be careful to
```

12:12:58
12:13:08
12:13:16
12:13:33
12:13:43

**OFFICIAL TRANSCRIPT**

1    monitor.  Because he might, because he's not causing any trouble,

2    rise in a level that's not appropriate for what he's participated

3    in.  And I think that's what you're seeing here.

4              THE COURT:  Yes, sir.

12:13:57   5              The last page of Exhibit 10 under progress/plan on

6    November 3, 2017.

7              He declined recommended treatment consistent with

8    mental health care level again, right?

9              THE WITNESS:  Yes.

12:14:06   10             THE COURT:  All right.  And we can move on to

11   Exhibit 11, which is the next exhibit, the Bureau of Prisons

12   Health Services Clinical Encounter for February 28, 2018.

13             He was a no show.  He failed to appear for a medication

14   management appointment; is that right?

12:14:23   15             THE WITNESS:  Yes.

16             THE COURT:  And on February 8, 2018, again under

17   assessment:  He did not think he has a mental illness.  He did

18   not agree with his diagnosis of schizophrenia.  He states they

19   "falsified me here" when speaking of the federal crime of

12:14:38   20   possession of fire weapon.  He said he had auditory

21   hallucinations.  He does not think he has a mental illness

22   because, quote, they -- that's what they want me to do, unquote.

23   He has limited insight.

24             Is that correct?

12:14:52   25             THE WITNESS:  Yes.

**OFFICIAL TRANSCRIPT**

```
 1          THE COURT:  Again, on January 29, 2018, same exhibit,
 2     he failed to appear.
 3          And I just want to follow up briefly with -- having
 4     read the transcript of the previous hearing, I want to follow up
 5     with some of your testimony and how it may relate to what you're
 6     testifying to today.
 7          And of course I understand, being a forensic
 8     psychiatrist, it's very difficult to predict danger.  There are
 9     things you look at.  But it's not like getting a blood test and
10     saying you're Type A or O or whatever.  It's not exactly the
11     same.  But you gave us some factors to look at in making that
12     determination, if I'm looking at your testimony correctly.
13          THE WITNESS:  Okay.
14          THE COURT:  One thing you say is the person has to have
15     a psychiatric disorder.
16          He has one, correct?
17          THE WITNESS:  Yes.
18          THE COURT:  He has a severe psychiatric disorder?
19          THE WITNESS:  Yes.
20          THE COURT:  Secondly, the person has to believe they
21     have a psychiatric disorder; is that correct?
22          THE WITNESS:  Yes.
23          THE COURT:  And he does not believe he has a
24     psychiatric disorder, does he?
25          THE WITNESS:  No, he doesn't.
```

12:15:12
12:15:28
12:15:41
12:15:46
12:15:55

**OFFICIAL TRANSCRIPT**

1    THE COURT:  Three, does the person cooperate in

2  treatment for the psychiatric disorder if the disorder is driving

3  the dangerousness?

4    Of course, I refer to Page 8, Exhibit 1, where you say

*12:16:08*    5  his willingness to take medication is very recent.

6    Also Page 10 of Exhibit 1 where you say the defendant

7  does not think he needs medication.  He still thinks he does not

8  have a mental illness.

9    And then Exhibit 1, Pages 30 through 32, which I think

*12:16:21*   10  I spoke about earlier.

11    So looking at those factors, I assume you still have

12  concern that if he were released under the wrong circumstances or

13  with inappropriate -- or conditions which would not give him the

14  best chance of -- what is the word I'm looking for?  The best

*12:16:46*   15  chance of succeeding and doing better or improving, that this

16  could be -- it could be a real problem?

17    THE WITNESS:  Oh, yeah.  I mean, if those conditions

18  aren't in place and they aren't locked down.  You know,

19  obviously, this is a repeated theme over and over again in the

*12:17:03*   20  hospitalization.

21    THE COURT:  Quite frankly, at this point, Doctor -- and

22  I'll get your opinion about this.  I want to commend Mr. Palmer

23  on doing what he needs to do to try to improve his current

24  situation and get to the conditional release stage.  But it does

*12:17:21*   25  not appear to the Court, at this stage, that the compliance has

**OFFICIAL TRANSCRIPT**

1  been sufficient and the insight is sufficient, and some of these
2  other issues we talked about that concern the Court, to at least
3  have the Court believe at this point that a conditional release
4  would be appropriate without him having to prove himself some
*12:17:41*  5  more in the future.  Would that be an improvident course for the
6  Court to take?

7        THE WITNESS:  No.  I think the things that you're
8  bringing up are the major issues that we have concerns about with
9  ongoing dangerousness, is that we always want the patient to be
*12:17:59*  10  able to recognize that they have a mental disorder and that they
11  need to take medications, because that gives us an indication
12  that they're going to participate in the process.

13        And he's adamantly held that he doesn't need to take
14  medications, that he doesn't have a mental illness, and he's
*12:18:15*  15  going along with it.  But he's not, you know, believing that he's
16  taking the medication for the process.

17        THE COURT:  We lost him.

18                (A pause in the proceedings.)

19        THE COURT:  We're back on the record.

*12:29:45*  20        We don't seem to be able to get contact with him.
21        Is that right?

22        IT TECHNICIAN:  They are trying to dial him right now,
23  the lady from the other side.  What happened was they set him on
24  an automatic timer and the other side got disconnected.

*12:30:07*  25        THE COURT:  So they're calling in now?

**OFFICIAL TRANSCRIPT**

```
 1              IT TECHNICIAN:  She's trying to call in right now.

 2              THE COURT:  Calling in to whom?

 3              IT TECHNICIAN:  The conference right here.

 4              THE COURT:  How long is this going to take?

 5              IT TECHNICIAN:  We're trying now.

 6              THE COURT:  Let's wait.

 7                              (A pause in the proceedings.)

 8              THE COURT:  Glad to have you back, Mr. Palmer.  Thank

 9      you.

10              Let's focus on where he was before.

11              We're back on the record, and thank goodness Mr. Palmer

12      is back here by video.

13              I have no additional questions, but I would like to say

14      this, though.  On the next risk assessment panel that they have

15      at Rochester, assuming there's going to be one, that I would like

16      Dr. Hart, if possible, to be on that panel.

17              All right.  Is there anything that you would like to

18      follow up on, Mr. Upton?

19              MR. UPTON:  No, Your Honor.  I have nothing else to

20      follow up with this witness.

21              THE COURT:  All right.  Thank you.

22              We will give you an opportunity to, in privacy, speak

23      to your client, and then let us know how you wish to proceed.

24              I understand we have the rest of the hearing and we

25      have some briefing scheduled, but depending on, you know, the
```

**OFFICIAL TRANSCRIPT**

1    response we get from you and your client, we may cancel those
2    briefing schedules and not have them.
3          But you need to let us know whether you want to go
4    forward with the July 30th hearing.
5          And Dr. Thompson, I can't thank you enough.
6          THE WITNESS:  Oh, thank you.
7          THE COURT:  Have a wonderful vacation.
8          THE WITNESS:  Appreciate it.
9          THE COURT:  All right.  Counsel, we're going to be in
10   recess and we will wait to hear from Mr. Upton as far as --
11         MR. UPTON:  Okay.  Thank you.
12                          (A recess was taken.)
13                      **AFTER THE RECESS**
14                          (Call to order of the court.)
15         THE COURT:  Mr. Palmer is back with us by video
16   conference.
17         Mr. Upton, I understand you have something which you
18   want to advise the Court; is that correct?
19         MR. UPTON:  Yes.  Based on the fact that we understand
20   the -- that there isn't presently a facility for Mr. Palmer to be
21   placed in, I would ask to recess this hearing until we can get
22   the risk assessment team, as well as Daryl Naquin, the probation
23   officer, to evaluate the two facilities that Dr. Thompson has
24   identified as appropriate placements for Mr. Palmer.
25         And then once that is done, and once the assessment

12:34:09 (line 5)
12:34:18 (line 10)
12:51:07 (line 15)
12:51:22 (line 20)
12:51:59 (line 25)

**OFFICIAL TRANSCRIPT**

1  team has had time to issue its new report, we could then

2  reconvene.  We could notice the Court that we're ready to proceed

3  and we could reconvene and finish up this hearing.

4         THE COURT:  Now, you have spoken to your client about

*12:52:19*  5  what direction he wishes to take; is that correct?

6         MR. UPTON:  Yes.  I believe Mr. Palmer is okay with

7  that.

8         Is that correct, Mr. Palmer?

9         THE DEFENDANT:  That's correct.

*12:52:34*  10         THE COURT:  All right.  Well, the Court's position is

11  this:  Obviously there is no facility now, even if the Court

12  would order a conditional release, that would accommodate the

13  needs that Mr. Palmer has.

14         That doesn't mean there won't be such a facility in the

*12:52:53*  15  future that the Court would consider.

16         You heard what Dr. Thompson had to say.  You heard my

17  remarks.  I will be pleased to hear any additional testimony and

18  review any other documents provided to the Court at any date in

19  the future.

*12:53:06*  20         At this point I'm going to deny the motion for

21  conditional release, because there is not a facility where he

22  could be conditionally released, although denying it -- I'm going

23  to deny it without prejudice to bring it to the Court's attention

24  at any later date.

*12:53:23*  25         MR. UPTON:  All right.

**OFFICIAL TRANSCRIPT**

1    THE COURT:  I think it accomplishes the same thing, but

2  it is procedurally a little different.

3    MR. UPTON:  We would include the current testimony in

4  this proceeding -- it would be part of any future proceeding.

12:53:36  5    THE COURT:  Yes, sir.  You don't have to decide that

6  now, but you can do that later on.

7    And I would think that Dr. Thompson would testify in

8  the future should you find a place that would allow him to be

9  conditionally released under conditions which are agreeable with

12:53:49  10  Court.

11    Anything the government wants to say?

12    MS. JONES:  No, Your Honor.  Thank you.

13    THE COURT:  Thank you, Mr. Palmer, for participating.

14  Certainly appreciate that.  Best of luck to you.  Please continue

12:54:00  15  to comply and we hope certainly you improve.

16    And I thank both counsel.

17    We're in recess.

18    * * * *

19    **CERTIFICATE**

20    **I hereby certify this 19th day of July, 2018, that the
foregoing is, to the best of my ability and understanding, a true**

21  **and correct transcript of the proceedings in the above-entitled
matter.**

22

23    */s/ Mary V. Thompson*

                              _____

24                              Official Court Reporter

25

**OFFICIAL TRANSCRIPT**